**[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 68.]**

THE STATE OF OHIO, APPELLEE, *v.* COWANS, APPELLANT.

[Cite as *State v. Cowans*, 1999-Ohio-250.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-1312—Submitted December 2, 1998—Decided October 20, 1999.)

APPEAL from the Court of Common Pleas of Clermont County, No.
96-CR-005394.

_____

{¶ 1} Jessie J. Cowans, appellant, was convicted of the aggravated murder of Clara Swart and sentenced to death.

{¶ 2} Mrs. Swart, a sixty-nine-year-old widow, lived alone in a rural section of Clermont County. One day in July 1996, when her son, Timothy, was taking some items to the side of the road to be picked up as trash, Cowans drove up and asked if he could take a glider-type swing that Timothy had placed by the road. Timothy agreed and helped him load the swing onto his truck.

{¶ 3} On Wednesday, August 28, 1996, Mrs. Swart's neighbor Mildred Kilgore went to Mrs. Swart's house. Kilgore found Mrs. Swart standing outside talking to a man who looked like Cowans. When Kilgore approached, Mrs. Swart told the man that she was leaving with her friend, and he left. After he had gone, Mrs. Swart and Kilgore went inside, and Mrs. Swart said, "Oh, I'm scared. * * * He made me so nervous. * * * He scared me so bad." Kilgore asked, "Who was it, Clara?" Mrs. Swart replied, "It was the man who came and got the chair [*sic*] off the garbage a few weeks ago."

{¶ 4} At 8:00 a.m. on Thursday, August 29, a Clermont County Senior Services bus arrived at Mrs. Swart's house to pick her up. When Mrs. Swart did not respond to the sound of the driver's horn, the driver went to the door and knocked. She heard some noise inside the house, but Mrs. Swart did not answer

the door; nor did Mrs. Swart answer her telephone when the Senior Services office called. Mrs. Swart's son came to visit her later in the day and found her body.

{¶ 5} Mrs. Swart had been strangled with a purse strap, which was still around her neck. An electrical cord had been tied around her neck and to the handle of the refrigerator, and her hands had been tied with a telephone cord. She was still wearing her wedding ring and earrings. Officers found a palm print on a plastic bag covering a blender in Mrs. Swart's kitchen.

{¶ 6} After talking to Kilgore, sheriff's investigators began to consider Cowans a suspect. Investigators discovered that Cowans was on parole, so they called in his parole officer, Sandra Higgins, to help them obtain Cowans's fingerprints.

{¶ 7} The investigators believed that they lacked enough evidence to obtain a search warrant for Cowans's house. However, Higgins decided to search it herself in order to determine whether Cowans had violated his parole. Two deputies helped her. One of the deputies testified that he found an Emmett Kelly clown figurine in the closet of Cowans's bedroom. The figurine was later identified as belonging to Mrs. Swart. Subsequently, the deputies obtained Mrs. Cowans's permission to continue searching. In the closet, they found a small wooden car.

{¶ 8} While searching a wooded area behind Cowans's house, a deputy found other items taken from Mrs. Swart's house, including a wooden jewelry box. The little wooden car found in Cowans's house appeared to have been broken off the lid of that box.

{¶ 9} On the afternoon of September 2, Deputy Sheriff Jim DeCamp used a T-shirt belonging to Cowans to scent a bloodhound at Mrs. Swart's residence. Once scented, the dog appeared to track the scent from Mrs. Swart's backyard, over a fence, and for a short distance into a wooded area. The dog then lost the scent. After being rescented with the shirt, the dog appeared to follow it to the vicinity of a fallen tree where the handler was told that other deputies had found Mrs. Swart's

personal property. At this location, which was near the back end of Cowans's property line, the dog was pulled off the scent. Again the dog was rescented and it continued to Cowans's Chevrolet Blazer, which was parked at his house.

{¶ 10} Mamie Trammel, one of Cowans's neighbors, testified that she had a conversation with Cowans two days after the murder. Trammel testified that when she asked Cowans if he had heard about the murder, he said, "Yeah, isn't that terrible * * * to hang a lady by the refrigerator with her hands behind her back." This detail had not been made public by the sheriff's department.

{¶ 11} Cowans was arrested on September 2. Deputy Sheriff Robert Evans drove him to the Clermont County Jail on a route that led past Mrs. Swart's house. Evans slowed down as he passed the house, as he later testified, "just to see what Mr. Cowans would do." Staring at the house, Cowans began to talk about the case. He complained that, as an "ex-con," he was being "singled out." Evans testified that Cowans said he had heard on the news that Mrs. Swart "was hung" and had later heard that she was strangled—information that had not yet been made public. Cowans also said "that he had been there [at Mrs. Swart's house] on one occasion * * * for the purpose of picking up a swing."

{¶ 12} While confined in jail, Cowans discussed the charges against him with a fellow inmate, Marvin A. Napier. He told Napier at first that "he had chased some kids out of his backyard" and they "threw [some items] down on the ground. And he * * * went through some stuff and left what he didn't want and took what he did want."

{¶ 13} Napier testified that Cowans later admitted to killing and robbing Mrs. Swart and gave details consistent with the facts of the case. For example, Napier testified that Cowans said he had found Mrs. Swart in the bathroom and "jerked [her] up off the toilet." This was consistent with the fact that investigators found urine in the toilet bowl. Napier also testified that Cowans said he had tied Mrs. Swart with the phone cord, strangled her with a purse strap, and "ransacked"

the house; also, that an "old people's bus" arrived while he was there, and "[t]hey knocked on the door."

**{¶ 14}** Napier further testified that Cowans said he left Mrs. Swart's house and walked home through the woods, that he went through the stolen property as he went, and that he left most of it in the woods as "junk" but brought home "[s]ome clown figurines" and some jewelry. Cowans allegedly told Napier "that he wished he'd have took the earrings and the wedding band off the lady's finger."

**{¶ 15}** Cowans was indicted on four counts of aggravated murder. Count One alleged murder with prior calculation and design under R.C. 2903.01(A). Counts Two through Four alleged felony-murder under R.C. 2903.01(B). Each count carried four death specifications: one under R.C. 2929.04(A)(5), alleging that Cowans had a prior murder conviction, and three felony-murder specifications under R.C. 2929.04(A)(7). Other counts charged kidnapping under R.C. 2905.01(A)(2) (to facilitate commission of felony), kidnapping under R.C. 2905.01(A)(3) (with purpose to terrorize or inflict serious physical harm), aggravated robbery, and aggravated burglary.

**{¶ 16}** Cowans was convicted of all counts and specifications. (The prior-conviction specification was tried to the court pursuant to R.C. 2929.022.) After the verdict of guilty was announced, Cowans continued to profess his innocence and refused to attend or participate in the sentencing phase. He refused to present mitigating evidence and asked that the witnesses who were prepared to testify in mitigation also refuse to cooperate. The jury recommended the death sentence, and the trial judge imposed it.

**{¶ 17}** The cause is now before us upon an appeal as of right.

_____

*Donald W. White*, Clermont County Prosecuting Attorney, *Daniel J. Breyer*, Chief Assistant Prosecuting Attorney, and *David H. Hoffmann*, Assistant Prosecuting Attorney, for appellee.

*Carol A. Wright* and *Kristin Burkett*, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 18} We have reviewed the appellant's propositions of law and independently assessed the evidence presented through both the guilt and penalty phases of the trial. Based upon our review, we affirm Cowans's convictions and sentence of death.

I. Request to Replace Appointed Counsel

{¶ 19} In his first proposition of law, Cowans claims that a breakdown in communications between him and his court-appointed counsel was so serious as to entitle him to have new counsel appointed, and that the trial court's refusal to do so violated Cowans's Sixth Amendment right to counsel.

{¶ 20} The trial court appointed two attorneys, including the Clermont County Public Defender, to represent Cowans. Cowans requested new counsel, claiming that the public defender was pressing an unwanted plea bargain upon him. The trial court granted this first request for new counsel, discharged the appointees, and chose Bruce S. Wallace and Michael P. Kelly to represent Cowans.

{¶ 21} At a hearing on February 19, 1997 (about a month before voir dire began), Cowans asked the trial court to appoint new counsel to replace Wallace and Kelly. Cowans explained that he believed Wallace and Kelly thought he was guilty. Cowans also accused Wallace and Kelly of "wanting me to plead guilty and lie * * *." When the court inquired about this allegation, Kelly stated that he and Wallace had never told Cowans that they thought he was guilty, and never asked him to lie:

"[N]ever once has Mr. Wallace or I or Larry [Handorf, the court-appointed defense investigator] advised Mr. Cowans that we think he is guilty. At no time did that phrase ever pass between us. * * * [W]e did what all attorneys do with clients, discuss evidence and discuss theories. * * * We have given him theories of

evidence. It is not unusual in theories — approaches to deal with evidence — it is not unusual for attorneys and clients to disagree on approaches, and we have had some differences on approaches. But we have not said those things, nor have we ever asked Mr. Cowans to tell an untruth under oath or any other wise [*sic*]."

{¶ 22} The trial court found that Cowans's attorneys were representing him diligently, and refused to appoint new counsel "without more reasons" than Cowans had given. Cowans's attorneys informed the court during the hearing that Cowans had "demanded that we file" a motion to withdraw, and that therefore they would do so.

{¶ 23} Defense counsel filed a "motion for new counsel" on Cowans's behalf, for the sole reason that Cowans lacked "confidence in his present counsel" and therefore could not "adequately communicate with counsel and assist in the presentation of his case." At a hearing, Kelly informed the court that he and Wallace had visited Cowans in jail to discuss the state's case against him and to propose a defense strategy. Kelly said, "[T]here was a very loudly expressed dispute over some of those items"; after that, Cowans refused to speak to his attorneys except to ask them to file a motion for new counsel.

{¶ 24} Cowans told the court that he and his attorneys were "not getting along," and complained that Kelly "would come over to the jail  * * * and talk to me about that palm print." Cowans refused to explain further. The trial judge again denied the motion and indicated that he found no substantive reason why counsel should be replaced. Cowans told the court, "I'm not going to cooperate with this man." When the court denied Cowans's request, Cowans asked for a new judge. Cowans also indicated that he could not proceed *pro se* because he knew nothing about the law.

{¶ 25} On March 6, 1997, Kelly and Wallace filed a motion to withdraw on the ground that Cowans had refused to speak with them. This new motion stated that, although counsel had previously believed they could represent Cowans

effectively, they could no longer do so. Having just learned of Cowans's incriminating statements to Napier, counsel now believed they could not adequately prepare to rebut that testimony without Cowans's cooperation.

{¶ 26} Cowans contends that the trial court should have granted his motion for new counsel or the later motion of Wallace and Kelly to withdraw.

{¶ 27} "An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles* (C.A.6, 1990), 906 F.2d 1122, 1130. "[T]he trial judge may * * * [deny the requested substitution and] require the trial to proceed with assigned counsel participating if the complaint * * * is unreasonable." *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. The trial court's decision is reviewed under an abuse-of-discretion standard. *Iles*, 906 F.2d at 1130, fn. 8.

{¶ 28} Cowans's chief complaint was that his attorneys thought he was guilty. However, counsel deny ever expressing such a belief to Cowans. Even if counsel had explored plea options based on a belief that Cowans might be guilty, counsel's belief in their client's guilt is not good cause for substitution. " 'A lawyer has a duty to give the accused an honest appraisal of his case. * * * Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism.' " *Brown v. United States* (C.A.D.C.1959), 264 F.2d 363, 369 (*en banc*), quoted in *McKee v. Harris* (C.A.2, 1981), 649 F.2d 927, 932. " 'If the rule were otherwise, appointed counsel could be replaced for doing little more than giving their clients honest advice.' " *McKee*, 649 F.2d at 932, quoting *McKee v. Harris* (S.D.N.Y.1980), 485 F.Supp. 866, 869.

{¶ 29} For the same reasons, counsel's discussion of the palm print with Cowans was not good cause for substitution of counsel. Counsel would have rendered ineffective assistance had they *not* tried to discuss such important evidence with their client.

{¶ 30} Cowans also contends that the trial court should have given him new counsel because his refusal to speak with Kelly and Wallace rendered them unable to properly prepare his defense. Authority exists for the proposition that a "complete breakdown in communication" between the defendant and appointed counsel can constitute "good cause" for substitution. See, *e.g*., *United States v. Calabro* (C.A.2, 1972), 467 F.2d 973, 986; cf. *Iles*, 906 F.2d at 1130, fn. 8 ("total lack of communication" is a factor to be considered in determining whether trial court abused its discretion by denying substitution).

{¶ 31} While the court could have found that there had been a "*complete* breakdown" or "*total* lack of communication" between Cowans and his counsel at the time counsel filed their motion to withdraw on March 6, the record indicates that this temporary lack of communication did not continue after the motion to withdraw was denied. "[T]he record is replete with references to [counsel's] discussions with the defendant * * *." *Iles*, *supra*, at 1132. On March 24, 1997, when the jury was taken to view the crime scene, Cowans waived his right to be present in the following words: "Under the advice of my [c]ounsel, no, I waive that right, sir." This suggests that Cowans regarded his court-appointed attorneys as his counsel and shows that he considered their advice in making this decision.

{¶ 32} When Cowans missed part of the voir dire, one of his attorneys later went over the transcript of the missed hearing with him. When Cowans decided not to be present during the adjudication of the prior-conviction specification, counsel told the court that Cowans "was very cooperative * * * and was willing to discuss the matter with [counsel]." On other occasions when Cowans waived his right to be present at hearings, the record indicates that he discussed this decision with counsel. The record also indicates that counsel reviewed the autopsy report with Cowans and discussed with him at length whether he should testify or remain silent. Finally, Cowans and his attorneys discussed "on several occasions" his decisions to waive mitigation, forgo an unsworn statement, and wear his jail

8

uniform to court.

{¶ 33} Under the circumstances of this case, we cannot find that the trial judge abused his discretion in denying substitution of counsel. Cowans's first proposition of law is overruled.

## II. Search by Parole Officer

{¶ 34} When parole officer Higgins searched Cowans's home, she found evidence of his guilt—property stolen from Mrs. Swart. In his second proposition of law, Cowans claims this evidence should have been suppressed. Cowans contends that Higgins's warrantless search of his home violated the Fourth Amendment, because the parole officer was acting on behalf of the police to perform a search that police could not lawfully have performed themselves.

{¶ 35} On September 2, 1996, Higgins went to the Clermont County Sheriff's Office to help investigators obtain Cowans's fingerprints. After discussing the fingerprints with Higgins, deputies asked her to come with them to the crime scene. She rode with the deputies, leaving her car behind. Investigator Barry Jacobson went on to Cowans's house; Higgins waited outside Mrs. Swart's house with the other deputies.

{¶ 36} When Jacobson returned, he told Higgins and the deputies that he had spoken with Cowans's wife inside the house. Jacobson said he had "looked around" but had seen no incriminating evidence in plain sight. He told Higgins "that they had decided not to conduct any more search [and] didn't think there was anything they could do."

{¶ 37} Jacobson also said that Cowans had not come home the night before, and that Cowans's wife had indicated that Cowans might have gone to Kentucky. Higgins found this news "alarming" because she knew, from an earlier conversation with Cowans, that he wanted to move to Kentucky.

{¶ 38} Higgins thereupon "informed the deputies that it was my duty to go back and search the residence." The deputies did not ask her to do so, she testified;

she made this decision "on [her] own." Two deputies went along; Higgins testified that it is usual for law enforcement officers to accompany parole officers on searches.

{¶ 39} Higgins told Mrs. Cowans that she was there to conduct a search. Mrs. Cowans admitted Higgins and the deputies and showed them to Cowans's bedroom.

{¶ 40} Higgins testified that she conducted the search personally, although the deputies helped. She found marijuana, which she testified caused her "some concern." A deputy found the clown figurine. The figurine, Higgins testified, "didn't cause me any concern [at first] because I didn't know what it was." (Higgins apparently knew that a clown figurine had been stolen but erroneously thought the stolen figure was smaller.) The deputies warned her not to touch it. Higgins testified that she would not have seized the clown had the deputies not been there.

{¶ 41} Although she did not "physically take hold of" the clown, Higgins testified that she was responsible for its seizure: "I seized it  * * * [b]ecause I was the one conducting the search  * * * ."

{¶ 42} Higgins "continued to search for a few more minutes"; then the deputies summoned Jacobson. After Jacobson arrived, the search continued with Mrs. Cowans's written consent, and deputies found the little wooden car in Cowans's bedroom.

{¶ 43} After a hearing, at which Higgins was the sole witness, the trial court denied Cowans's motion to suppress the fruits of Higgins's search. Cowans contends that the clown and car should have been suppressed because Higgins's search violated the Fourth Amendment. Although the car was found as part of Jacobson's search, after Mrs. Cowans consented thereto, Cowans contends it was inadmissible as well, since the deputies would not have obtained Mrs. Cowans's consent to search further had they not first found the clown.

**{¶ 44}** Cowans concedes that a probation officer may search a probationer's home without a warrant and upon less than probable cause. See *Griffin v. Wisconsin* (1987), 483 U.S. 868, 877-878, 107 S.Ct. 3164, 3170-3171, 97 L.Ed.2d 709, 719-720. Moreover, the same rule applies to a parole officer's search of a parolee's home. See, *e.g.*, *United States v. Hill* (C.A.3, 1992), 967 F.2d 902, 909-910; *Latta v. Fitzharris* (C.A.9, 1975), 521 F.2d 246, 249-251.

**{¶ 45}** Nonetheless, Cowans argues that Higgins's search was illegal because Higgins was not acting "to achieve her own legitimate objectives." Rather, he claims, the deputies investigating the murder were using Higgins as a "stalking horse" to perform a search they could not lawfully perform themselves.

**{¶ 46}** If law enforcement rather than parole supervision was the primary purpose of Higgins's search, many authorities would indeed hold the search illegal. "[A] probation [or parole] search may not be used as a subterfuge for a criminal investigation." *United States v. Watts* (C.A.9, 1995), 67 F.3d 790, 793-794, citing *Latta, supra*. Accord *United States v. Martin* (C.A.6, 1994), 25 F.3d 293, 296.

**{¶ 47}** We recognize that after *Whren v. United States* (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, the Fourth Amendment does not forbid "pretextual" searches. See *United States v. Conway* (C.A.9, 1997), 122 F.3d 841, 845 (concurring opinion); *People v. Woods* (1999), 2 Cal.4th 668, 88 Cal.Rptr.2d 88, 981 P.2d 1019. However, the pretext doctrine may still apply to searches not requiring probable cause, such as searches by parole officers. See 4 LaFave, Search & Seizure (3 Ed.1996) (Supp.1999), at 78-79, Section 10.10. For purposes of this opinion, we assume it does.

**{¶ 48}** Based upon the testimony presented and the trial court's assessment of the credibility of the witnesses, the trial court made a factual finding that Higgins was *not* acting as a stalking horse for the deputies. Instead, the court found, she "had her own objectives in conducting the search." We are bound by that finding unless the record contains insufficient evidence to support it. We find, in this case,

that there was sufficient evidence on the record to support the trial court's finding.

{¶ 49} Higgins testified that she made the decision to search by herself: "I was the one conducting the search[;] it was my search." There is no evidence that the deputies asked or encouraged Higgins to search. Cowans argues that Jacobson "was more than happy to provide assistance" to Higgins. But Jacobson did not testify at the suppression hearing, and the hearing record contains no basis for speculation about his state of mind. Besides, it is Higgins's, not Jacobson's, state of mind that is at issue. See *State v. Hill* (App.1983), 136 Ariz. 347, 349, 666 P.2d 92, 94. The question is whether Higgins was trying to investigate possible parole violations or to help the deputies circumvent the warrant requirement.

{¶ 50} Cowans argues that Higgins's seizure of the clown shows that her purpose was not really parole supervision, since she would not have seized it had the deputies not been there to explain its significance to the murder investigation. But, since the murder was a parole violation as well as a crime, the clown was evidence of a parole violation; hence, her seizing the clown does not necessarily suggest an ulterior law-enforcement motive. The trial court could have drawn that inference, perhaps, but it did not, and thus we cannot.

{¶ 51} Nor does the deputies' assistance taint Higgins's search. "[C]ollaboration between a [parole or] probation officer and police does not in itself render a [parole or] probation search unlawful." *Watts*, *supra*, 67 F.3d at 794. Accord *United States v. Cardona* (C.A.1, 1990), 903 F.2d 60, 66; *United States v. Coleman* (C.A.7, 1994), 22 F.3d 126, 129; *United States v. Butcher* (C.A.9, 1991), 926 F.2d 811, 815, quoting *People v. Kanos* (1971), 14 Cal.App.3d 642, 649, 92 Cal.Rptr. 614, 617. See, generally, LaFave, *supra*, at 792-793, Section 10.10(e); 2 Hall, Search & Seizure (2 Ed.1993) 213, Section 25:17.

{¶ 52} Admittedly, "it 'is often difficult to distinguish cases of valid cooperation from cases of impermissible collusion between parole and police authorities.' " LaFave, *supra*, at 795, quoting Note (1976), 51 N.Y.U.L.Rev. 800,

829. But Higgins testified that she conceived and executed the search and that her concern was with parole violations, and the trial judge believed her. As the determinations rest mainly on the trial court's assessment of witness credibility, we defer to the finding and overrule Cowans's second proposition of law.

### III. Video of Bloodhound's Path

{¶ 53} When Deputy DeCamp and the bloodhound attempted to track Cowans's scent from Mrs. Swart's house, Investigator Mike Robinson went with them. A week later, Robinson retraced their path, making a videotape as he walked to illustrate the general path the dog had taken in following the scent. The videotape was introduced at trial, supported by testimony by Robinson. In his third proposition, Cowans contends that this video was irrelevant and unfairly prejudicial because it was not an exact illustration of the dog's path.

{¶ 54} Cowans points out that the dog lost the scent at least once, relatively early on in the tracking and had to be rescented, an event not shown on the video. The record indicates that the dog lost the scent at least twice during the tracking process. Moreover, Robinson's path as shown on the video was more direct and admittedly faster than the dog's route.

{¶ 55} Nevertheless, introduction of the video was not so prejudicial that its admission rises to the level of an abuse of discretion. The video showed only the general contours of the dog's path, and the officer readily admitted this. Robinson fully explained to the jury that the video did not precisely show each deviation in the dog's path. "An exhibit is not necessarily incompetent because it fails to show some exact thing in connection with the subject under investigation, provided it shows some matter bearing directly upon the matter under investigation, with an explanation of how it differs from that which is being investigated." *Cleveland Provision Co. v. Hague* (1912), 20 Ohio C.C.(N.S.) 34, 41 Ohio C.C. 223, 230, affirmed (1912), 87 Ohio St. 483, 102 N.E. 1121. See, also, *State v. Palmer* (1997), 80 Ohio St.3d 543, 564-566, 687 N.E.2d 685, 704-705.

**{¶ 56}** When an exhibit is offered for purposes of illustration, the trial court has discretion to determine whether it is helpful or misleading to the trier of fact. See, generally, *Palmer*, 80 Ohio St.3d at 566, 687 N.E.2d at 705; 2 McCormick on Evidence (4 Ed. Strong Ed.1992) 9-10, Section 212. Cowans has not shown an abuse of discretion. Consequently, his third proposition is overruled.

IV. Evidence of Defendant's Status as Parolee

**{¶ 57}** In his fourth proposition, Cowans contends that evidence of his status as a parolee should have been excluded.

**{¶ 58}** The defense filed a motion *in limine* to preclude the state from introducing evidence of Cowans's previous murder as a "similar act" under Evid.R. 404(B). The trial court granted the motion. Cowans also elected to try the R.C. 2929.04(A)(5) prior murder specification to the court under R.C. 2929.022(A). Accordingly, there was no direct reference during the guilt phase to Cowans's prior conviction. The trial court did, however, permit Higgins to testify that she was Cowans's parole officer. Cowans contends that this testimony "undercut" the trial court's earlier ruling and prejudiced him.

**{¶ 59}** We cannot agree. At no time during the guilt phase did the trial court, the parties, or any witness refer to the basis for Cowans's parolee status. The jury was informed only that Cowans was a parolee. The jury never learned that he had a prior murder conviction or even a felony conviction until the sentencing phase. In addition, the trial court instructed the jury not to consider Cowans's parolee status as character evidence.

**{¶ 60}** Moreover, Cowans's status as a parolee was relevant in the guilt phase, even though the nature of his previous crime was not. Higgins searched Cowans's house and found property that had been stolen from Mrs. Swart. Higgins was able to search Cowans's house because she was his parole officer. Without knowing her relationship to Cowans, the jury could not have understood why Higgins was searching Cowans's house. Cf. *State v. Allen* (1995), 73 Ohio St.3d

626, 632, 653 N.E.2d 675, 683. Thus, Higgins's position as Cowans's parole officer was, as the trial court put it, "inextricably intertwined" with her testimony about the search. Accordingly, Cowans's fourth proposition is overruled.

### V. Stacking Inferences

{¶ 61} In his fifth proposition of law, Cowans contends that State's Exhibit 58, a photograph showing a BB pistol in Cowans's truck, was inadmissible because the state's theory as to the relevance of the pistol required the jury to draw an inference from another inference.

{¶ 62} A trier of fact may not draw "[a]n inference based  * * * entirely upon another inference, unsupported by any additional fact or another inference from other facts[.]" *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraph one of the syllabus. However, "[a]n inference  * * * based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in  * * * ." *Id.*, paragraph two of the syllabus.

{¶ 63} Cowans argues that the state began with a fact — the absence of defense wounds — and from that fact drew an inference that Mrs. Swart's killer used a weapon to subdue her. Then, Cowans argues, the state drew a second inference—that the BB gun found in Cowans truck was the weapon used.

{¶ 64} We agree. The state's theory involves a string of inferences. First, the state must infer from the lack of defensive wounds that Mrs. Swart was somehow frightened into submission. Second, the state infers from the testimony of Cowans's wife that Cowans, at some time, had possession of the BB gun found in his truck. From these two inferences, which are admittedly supported by separate and independent facts, the state builds its theory with additional inferences, unsupported by additional facts or reasonable parallel inferences. In order to connect the gun to the crime, the state must infer that Cowans had possession of the gun on the day of the crime, that he carried the gun to Mrs. Swart's residence, that

he brandished the gun, and that the gun caused Mrs. Swart to submit to Cowans during her own murder by strangulation.

{¶ 65} The state argues that the second inference (that Cowans used the BB gun found in the truck during the crime) is not based entirely upon the first inference (that a weapon was used to subdue Mrs. Swart) but upon three additional facts. First, the dog tracked Cowans's scent from Mrs. Swart's house to the truck; and second, the gun was found in the truck; and third, that gun was not ordinarily kept in the truck.

{¶ 66} The first alleged fact is that the dog tracked Cowans's scent from Mrs. Swart's house to the truck. However, this is in itself an inference rather than a fact. The record contains ample testimony from the state's witness acknowledging that an officer can only infer that the dog is following the scent it was asked to follow even under the best of circumstances. Further, in setting forth this proposition, the state ignores the fact that at least twice between the Swart residence and the truck, the dog lost Cowans's scent and had to be rescented with his shirt. Compounding this, the last time the dog was rescented it was near Cowans's property line in an area he was known to have frequented and from there appeared to track his scent to the truck. Without some additional factual basis, the state's conclusion that this last portion of the tracking somehow connects the truck to Cowans on the day of the murder is an unreasonable inference.

{¶ 67} Absent any direct connection between the truck and the Swart residence, the fact that a BB gun was found in the truck does not support a reasonable inference that Cowans used the gun to intimidate Mrs. Swart during the course of a murder. Third, the fact that the gun was normally kept in a drawer could support an inference that Cowans moved the gun to the truck, but it does not establish it as fact.

{¶ 68} Because we agree that the state's theory regarding the gun's relevance would require the factfinder to draw an inference from an inference, we

find merit in Cowans's contention that the picture of the gun was impermissibly admitted into evidence. We also, however, hold that under the facts of this case, the admission was harmless error. Because the use of a gun was not a critical element of the crime, and because the state advanced other theories of why Mrs. Swart may not have suffered defensive wounds, which were supported by admissible evidence, we find that admitting the picture of the BB gun was harmless error.

## VI. Defendant's Refusal to Present Mitigation

{¶ 69} After the jury found him guilty, Cowans specifically refused to let his counsel present any evidence in mitigation; moreover, he instructed his family and friends not to cooperate with his defense team's efforts to find mitigating evidence. Cowans also declined to make an unsworn statement to the jury, explaining that he did not trust "a jury that found me guilty on something I didn't do" to give him "a fair shake."

{¶ 70} Cowans's refusal to present any mitigating evidence in the penalty phase is the subject of his sixth, seventh, and eighth propositions of law.

### A. Eighth Amendment

{¶ 71} Cowans in his sixth proposition of law argues that the Eighth Amendment forbids the imposition of a death sentence by a sentencer who has not been apprised of possible mitigating factors, even where the defendant himself opposed their presentation. That, however, is an argument we have rejected. The Eighth Amendment compels no one to present mitigation against his will. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 27-29, 553 N.E.2d 576, 583-586; *State v. Ashworth* (1999), 85 Ohio St.3d 56, 61-66, 706 N.E.2d 1231, 1236-1239.

{¶ 72} Indeed, we recently noted in *Ashworth*, 85 Ohio St.3d at 63, 706 N.E.2d at 1237-1238, that "a rule requiring the presentation of mitigating evidence would be impossible to enforce," because no court could compel a defendant to cooperate with his counsel in gathering and presenting such evidence. This case

aptly illustrates the point: Cowans not only refused to present mitigating evidence, he actually blocked his counsel's acquisition of such evidence by instructing his family and friends not to cooperate with counsel.

## B. Ineffective Assistance

{¶ 73} In his seventh proposition of law, Cowans contends that, by acquiescing in his instructions not to present mitigating evidence, his counsel denied him their effective assistance.

{¶ 74} Cowans concedes that legal ethics normally require an attorney to "abide by a client's decisions concerning the objectives of representation." ABA Model Rule of Professional Conduct 1.2(a). Indeed, DR 7-101(A)(1) provides: "A lawyer shall not intentionally * * * [f]ail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules * * *."

{¶ 75} Despite this, Cowans argues that counsel's obligation to present mitigation in a capital case supersedes the obligation to let the client choose his own course of action.[1]

{¶ 76} We disagree. Like other courts, we have rejected the notion that an attorney renders ineffective assistance by declining, in deference to a client's desires, to present mitigation. *Tyler*, *supra*; *State v. Keith* (1997), 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47, 67. Accord *State v. Koedatich* (1988), 112 N.J. 225, 332-335, 548 A.2d 939, 995-996; *Kirksey v. State* (1996), 112 Nev. 980, 995-996, 923 P.2d 1102, 1112, and cases cited therein.

## C. Validity of Waiver

{¶ 77} In his eighth proposition of law, Cowans contends that the trial court should have (1) held a hearing to determine his competence to waive mitigation,

---

1. Cowans cites *People v. Deere* (1985), 41 Cal.3d 353, 710 P.2d 925, 222 Cal.Rptr. 13, and two California cases decided on authority of *Deere*. However, *People v. Bloom* (1989), 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, overruled *Deere* on the relevant issue.

and (2) taken steps to ensure that his waiver was knowing and voluntary.

### 1. Competence

**{¶ 78}** The principal contention of Cowans's eighth proposition is that, whenever a capital defendant declines to present evidence in mitigation, the trial court must determine on the record whether he has the mental capacity to appreciate his position and make a rational choice with respect to presenting mitigation *vel non*.

**{¶ 79}** However, a capital defendant's decision to forgo mitigation "does not by itself call his competence into question." *Tyler*, 50 Ohio St.3d at 29, 553 N.E.2d at 585. Accord *State v. Berry* (1995), 72 Ohio St.3d 354, 361, 650 N.E.2d 433, 440 (*Berry I*). Therefore, "absent a request by counsel, or any indicia of incompetence, a competency evaluation is not required." *Ashworth*, *supra*, 85 Ohio St.3d at 62, 706 N.E.2d at 1237, citing *Tyler*, 50 Ohio St.3d at 29, 553 N.E.2d at 585.

**{¶ 80}** Cowans argues that *Tyler* is inconsistent with our recent decision in *State v. Berry* (1997), 80 Ohio St.3d 371, 686 N.E.2d 1097 (*Berry II*). In *Berry II*, a condemned prisoner, having exhausted his direct appeals, wished to waive further challenge to his convictions and sentence. We ordered a hearing on the issue of Berry's competence and found him competent only after reviewing the hearing record.

**{¶ 81}** When a capital defendant decides to waive his right to present mitigation (*Tyler*), or to review of a conviction and sentence (*Berry II*), a court must inquire into his competence to do so if some reason, *other than that decision*, exists to question competence. Thus, in *Rees v. Peyton* (1966), 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583, the court denied a condemned prisoner leave to withdraw his certiorari petition, since his attorney had submitted a psychiatric report calling the prisoner's competence into question.

**{¶ 82}** Conversely, where no independent reason to question competence

exists, no hearing is required. Thus, in *Hammett v. Texas* (1980), 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086, the court permitted a condemned prisoner to withdraw his petition; the difference was that nobody questioned Hammett's competence. The decision to forgo challenging his death sentence was not sufficient of itself to require an evaluation.

{¶ 83} *Tyler* is no more inconsistent with *Berry II* than *Hammett* is with *Rees*. In *Berry II* we had reason to question Berry's competence other than his desire to be executed, that being Berry's history of hallucinations and a diagnosis of a psychotic disorder before his aggravated murder trial. 80 Ohio St.3d at 377, 686 N.E.2d at 1102; see, also, *Berry I*, 72 Ohio St.3d at 367, 650 N.E.2d at 444 (Wright, J., dissenting). In *Tyler*, on the other hand, there was nothing in the record to raise any question as to the defendant's competence. 50 Ohio St.3d at 29 and 38-39, 553 N.E.2d at 585 and 593-594.[2]

{¶ 84} Hence, we reject Cowans's claim that a trial court must always inquire into the competence of defendants who refuse to present mitigation. No such inquiry need take place unless some reason exists to doubt the defendant's competence.

{¶ 85} It remains to ask whether, in this case, anything in the record actually raised a question as to Cowans's competence.[3] On this point, we take our guidance from the trial judge, who stated in his sentencing opinion that Cowans "evidenced no mental instability."

{¶ 86} The record shows, and the trial judge noted in his opinion, that

---

2. *Tyler* did not hinge on any affirmative showing of Tyler's competence. Rather, we asked whether there was any reason to *doubt* his competence. 50 Ohio St.3d at 29, 553 N.E.2d at 585. Since Tyler cited no basis for questioning competence other than his decision to waive mitigation, it followed that no hearing was necessary.

3. Cowans makes no claim that any actual indicia of incompetence are to be found in the record, preferring instead to argue that we should require competency hearings as a matter of course for all defendants who want to waive mitigation.

Cowans was uncooperative and disruptive at certain times during this case. At the beginning of the case, Cowans expressed a belief that he had no chance of a fair trial because his first set of assigned counsel thought he was guilty. He asked that counsel be replaced because they allegedly discussed plea-bargain options with him, and he expressed a fear that the originally appointed counsel would control anyone else from that counsel's office, so that appointing new counsel from the same office would be "just like hanging me * * *."

{¶ 87} After the court appointed new counsel, Cowans proceeded to challenge these counsel as well, claiming they were trying to pressure him into pleading guilty. When the court refused Cowans's second request for new counsel, Cowans refused to accept the court's decision and stood up as if to leave the courtroom. When the trial judge asked Cowans for his assurance that he would not be disruptive, Cowans repeated his demand for new counsel rather than answering. The judge therefore had him removed.

{¶ 88} Brought back to court for a subsequent hearing, Cowans doggedly repeated his demands for new counsel, accused the judge of bias, and became angry because someone was, or appeared to be, laughing at him.

{¶ 89} Subsequently, however, Cowans cooperated with his counsel (see discussion of Cowans's first proposition of law, *supra*) and created no further problems until the guilt-phase verdicts were read. When Cowans found that he had been convicted, he directed a profane outburst at the court and jury, and then expressed his wish to leave the courtroom. The court ordered Cowans taken to a room in the courthouse basement equipped with closed-circuit TV and audio, so he could see and hear the rest of the proceedings. After the jurors returned to the jury room, a deputy reported to the judge that Cowans had disabled the TV and was asking to be taken back to jail.

{¶ 90} Next, Cowans refused to take part in the R.C. 2929.022 evidentiary hearing on the prior-conviction specification. His counsel explained that Cowans

wished to boycott the remainder of the trial because he felt that "the jury that's already found him guilty of 20 counts  * * * would be biased against him when it came to any mitigation," and that the court was also biased.

**{¶ 91}** The trial court ordered that Cowans be returned to the basement room with the closed-circuit TV.  In disrespectful and sometimes foul language, Cowans protested that he regarded the court as a "kangaroo court" and did not want to be in the courthouse at all.

**{¶ 92}** Minutes later, Cowans's counsel informed the court that Cowans was refusing to watch the proceedings and was demanding that the audio be turned down.  He was also physically resisting the three deputies guarding him.

**{¶ 93}** Despite this behavior, the trial judge found, "While disruptive, the Defendant *evidenced no mental instability but rather acted out his pique*." (Emphasis added.)

**{¶ 94}** In a wide variety of situations, we have affirmed that factual determinations are best left to those who see and hear what goes on in the courtroom.  See, *e.g.*, *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920 (deferring to trial judge's determination of challenge for cause); *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584 (weight of evidence and witness credibility are for trier of fact); *State v. Morales* (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267, 271 (effect on jury of spectator's emotional outburst is fact question for trial court); *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373, 381 (trial counsel were in better position than reviewing court to determine how jurors should be questioned).

**{¶ 95}** Similarly, when a trial court must decide whether to hold a hearing on the defendant's competence to stand trial, reviewing courts "give weight  * * * to the trial judge's opportunity to observe the defendant  * * *." *Commonwealth v. Hall* (1982), 15 Mass.App. 1, 3, 443 N.E.2d 121, 122.

**{¶ 96}** *Maggio v. Fulford* (1983), 462 U.S. 111, 117, 103 S.Ct. 2261, 2264,

76 L.Ed.2d 794, 799-800, illustrates the principle. There, it was held that "[t]he trial judge's observation of [the defendant's] conduct" provided record support for the conclusion that "there was insufficient question as to [the defendant's] competence to warrant" further inquiry. Accord *People v. Danielson* (1992), 3 Cal.4th 691, 727, 13 Cal.Rptr.2d 1, 21, 838 P.2d 729, 749; *People v. Morino* (Colo.App.1987), 743 P.2d 49, 52; *State v. Zorzy* (1993), 136 N.H. 710, 715, 622 A.2d 1217, 1219-1220; *State v. Edwards* (S.D.1997), 572 N.W.2d 113, 117-118.

{¶ 97} We think the trial court's factual finding in this case ought to receive the same respect. "Face to face with living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. * * * How can we say the judge is wrong? We never saw the witnesses." *Boyd v. Boyd* (1930), 252 N.Y. 422, 429, 169 N.E. 632, 634.

{¶ 98} Likewise, we never saw Cowans, and thus can hardly say that the trial judge here was wrong when he said that Cowans "evidenced no mental instability." Limited to reviewing the black-and-white record, we are in no position to second-guess factual determinations made by a trial judge, which may be based on a person's demeanor, conduct, gestures, tone of voice, or facial expressions. (The judge here took specific notice of Cowans's demeanor, which "would range from smiling and relaxed * * * to angry and vocal when he was denied a request or his position was challenged.")

{¶ 99} Indeed, it is noteworthy that *nobody* on the spot thought Cowans's behavior raised any question as to his competence. Defense counsel, who appear to have done a diligent job of defending a difficult client, made no suggestion that Cowans might lack the competence to waive mitigation.

{¶ 100} That competence, as we have recently held, is measured by the following test: "A [capital] defendant is mentally competent to forgo the presentation of mitigating evidence * * * if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent

decision not to pursue the presentation of evidence. The defendant must fully comprehend the ramifications of his decision and must possess the ability to reason logically, *i.e*., to choose means that relate logically to his ends." *Ashworth*, 85 Ohio St.3d at 69, 706 N.E.2d at 1241.

{¶ 101} The defendant's behavior here did not inherently raise questions concerning his capacity to understand the difference between life and death, to fully comprehend the ramifications of his decision, or to reason logically. Moreover, the trial judge, based on his observations of this defendant, and having the defendant's displays of temper in mind, found that these displays resulted from pique, not mental instability. Thus, in order to find error, we would have to second-guess the express factual determination of the trial judge. This we decline to do. We therefore find that the trial court was not required to order a competency hearing *sua sponte*.

2. Knowing and Voluntary Waiver

{¶ 102} Cowans also suggests, in this proposition of law, that the trial court failed to determine whether his waiver of the right to present mitigating evidence was knowing and voluntary.

{¶ 103} In *State v. Ashworth* (1999), *supra*, at paragraph one of the syllabus, we held that a waiver of the presentation of mitigating evidence must be knowing and voluntary, and that to ensure this, the trial court must conduct an inquiry of the defendant on the record.

{¶ 104} Pursuant to *Ashworth*, the record must affirmatively demonstrate that (1) the court has informed the defendant of the right to present mitigating evidence, (2) the court has explained what mitigating evidence is, (3) the defendant understands the importance of mitigating evidence, (4) the defendant understands the use of mitigating evidence to offset the aggravating circumstances, (5) the defendant understands the effect of failing to present mitigating evidence, and (6) the defendant wishes to waive mitigation. *Ashworth* at 62, 706 N.E.2d at 1237.

24

{¶ 105} Our primary reason for requiring this procedure was to ensure that a defendant understood the importance of presenting mitigating evidence, discussed these issues with counsel, and confirmed in open court that he or she wished to waive presentation of mitigating evidence. Only then could the trial court, and this court, be assured that the defendant knowingly and voluntarily waived this substantial and important right to show the jury or three-judge panel why the death penalty should not be imposed in his or her particular case.

{¶ 106} Although the trial court in this case did not have the benefit of our decision in *Ashworth*, the procedures used in this case to advise Cowans of the potential consequences of his decision were substantially similar to those adopted in *Ashworth*. The transcripts of the sentencing hearing reflect that the court engaged in communications with the defendant over a two-day period. These communications included apprising him that he had a right to present testimony and make a statement, explaining to him that his attorneys had prepared to present witnesses, inquiring why Cowans did not want to present mitigating evidence, and informing him that if he presented no evidence the jury would probably impose the death penalty.

{¶ 107} This colloquy complies with many of the requirements set forth in *Ashworth*. Further, defense counsel stated that they had discussed the issue with Cowans and that he had not arrived at his decision lightly.

{¶ 108} Yet, the trial court failed to address all six *Ashworth* requirements in its colloquy with Cowans. Most notably, there was no explanation of what mitigating evidence is, and no finding on the record that Cowans fully understood the ramifications of failing to present mitigating evidence or desired to waive his rights.

{¶ 109} While this procedure fell short of that established in *Ashworth*, we hold that our ruling in *Ashworth* is prospective only. We cannot hold the trial court accountable for not following a procedure that was not established, or even

foreshadowed, when the case was tried.

{¶ 110} We are not holding today that substantial compliance is enough to satisfy the requirements of *Ashworth*; however, the trial court here, like the trial court in *Ashworth*, did engage the defendant in a colloquy concerning the waiver of mitigation, even though no guidelines were in place when Cowans was tried. Given the content of the trial court's colloquy, there is nothing to indicate that Cowans did not knowingly and voluntarily relinquish his right to present mitigating evidence. Since the decision in *Ashworth* is prospective only, the failure to comply with *all* of the procedural requirements set forth in *Ashworth* is not error in this case.

{¶ 111} To sum up: Cowans's desire to waive mitigation did not automatically require a competency hearing, nor did the record create a doubt as to his competence such as to require a competency hearing; the record indicates that Cowans's waiver was knowing and voluntary; and, although the specific procedural requirements of *State v. Ashworth* were not complied with in full, they are prospective only and hence do not apply here. Accordingly, Cowans's eighth proposition of law is overruled.

## VII. Other Issues

{¶ 112} In his ninth proposition of law, Cowans complains that the guilt-phase evidence was reintroduced in the penalty phase.

{¶ 113} However, the trial court may admit evidence raised at trial that is relevant to the nature and circumstances of the aggravating circumstances in the penalty phase. See *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus; *State v. Mason* (1998), 82 Ohio St.3d 144, 165, 694 N.E.2d 932, 954, citing *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81. At trial, Cowans did not identify any specific evidence to which he objected. Thus, he has waived any objection relating to the relevance of specific items. Cf. *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866, 887.

{¶ 114} In his tenth proposition of law, Cowans raises already-settled issues

about the constitutionality of Ohio's death-penalty statutes. These issues are summarily overruled. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; *State v. Spisak* (1988), 36 Ohio St.3d 80, 521 N.E.2d 800.

## VIII. Independent Review

{¶ 115} We must now independently review Cowans's death sentence. Initially, we note that the four counts of aggravated murder, all of which involved the same victim, merge. See, *e.g*., *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066.

{¶ 116} R.C. 2929.05(A) requires that we determine whether the evidence supports the finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and whether the death sentence is proportionate to the penalty imposed in similar cases.

{¶ 117} The evidence supports the finding of aggravating circumstances. Cowans was convicted of an aggravating circumstance under R.C. 2929.04(A)(5)—having a prior conviction of an offense involving "the purposeful killing of or attempt to kill another * * *." Cowans had been convicted of murder, R.C. 2903.02, in 1978. The state proved this specification with a certified copy of the judgment of conviction and the testimony of Cowans's parole officer.

{¶ 118} Cowans was also convicted of three separate aggravating circumstances under R.C. 2929.04(A)(7): aggravated burglary, aggravated robbery, and kidnapping. The evidence supports the finding of these aggravating circumstances as well. There can be no doubt that Clara Swart—tied up, robbed, and murdered in her own home—was the victim of a kidnapping, aggravated robbery, and aggravated burglary.

{¶ 119} The evidence was more than sufficient to prove that Cowans committed these acts. Items belonging to Mrs. Swart were found inside Cowans's house and on or near his property. The bloodhound tracked Cowans's scent from Mrs. Swart's house to the tree where some of the victim's personal property had

been dumped, and from there to Cowans's truck.

{¶ 120} Cowans's palm print on the plastic bag places him inside Mrs. Swart's house. Yet Cowans did not enter the house on the July day when he took the discarded swing, and it is unlikely that he went inside on August 28, the day of Kilgore's visit. Since that was the day Mrs. Swart told Kilgore she was afraid of Cowans, one can reasonably infer that she had not invited him in.

{¶ 121} Cowans tried to mislead Deputy Evans by implying that he was at Mrs. Swart's house only once. He also hinted to Mamie Trammel that she should say that he was at her house on the morning of August 29, which Trammel testified was not so. Cowans stated twice (to Trammel and to Evans) that Mrs. Swart had been "hung," a detail not disclosed to the news media. Finally, he admitted his guilt to Marvin Napier.

{¶ 122} Cowans expressly refused to present any mitigation or make an unsworn statement in the penalty phase. Nor have we found in the guilt phase any of the other mitigating factors listed in R.C. 2929.04(B)(1) through (B)(6). Nor do we find therein any other reason not to sentence Cowans to death. See R.C. 2929.04(B)(7).

{¶ 123} Nothing in the nature and circumstances of this case, as revealed at the guilt phase, constitutes a mitigating factor. The record shows that Cowans was unemployed at the time of the murder and wanted to leave Ohio, but this deserves no weight in mitigation. The record shows that Cowans once worked at a restaurant in Kentucky, but there is no evidence concerning his work record or any other evidence going to his history or background.

{¶ 124} We note that Cowans's wife testified on his behalf in the guilt phase. We infer that she loves him, and that is a mitigating factor, but it deserves no appreciable weight in this case. We also agree with the trial court that Cowans's kindness to animals deserves no weight in this case.

{¶ 125} The state proved four aggravating circumstances at trial. Cowans

is a recidivist murderer who invaded his victim's home, tied her up, and killed her to steal a few trinkets. Mitigation is nearly nonexistent. We conclude that the aggravating circumstances in this case outweigh any mitigating factors beyond a reasonable doubt.

{¶ 126} Cowans's death sentence, we find, is proportionate to sentences approved in similar cases. See *State v. Tyler*, *supra* (robbery-murder); *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549 (robbery-murder); *State v. Waddy* (1992), 63 Ohio St.3d 424, 588 N.E.2d 819 (kidnapping, aggravated burglary); *State v. Cook* (1992), 65 Ohio St.3d 516, 605 N.E.2d 70 (kidnapping, aggravated robbery); *State v. Allen* (1995), 73 Ohio St.3d 626, 653 N.E.2d 675 (robbery-murder); *State v. Otte* (1996), 74 Ohio St.3d 555, 660 N.E.2d 711 (felony-murder, multiple-murder); *State v. Spivey* (1998), 81 Ohio St.3d 405, 692 N.E.2d 151 (felony-murder).

{¶ 127} For all of the foregoing reasons, the judgment of the court of common pleas imposing the sentence of death on Jessie J. Cowans is affirmed.

*Judgment affirmed.*

DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., dissents.

_____

**MOYER, C.J., dissenting.**

{¶ 128} In *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, we held that "when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis *sic*.) We also held that a defendant must be competent to forgo the presentation of mitigating evidence. *Id.*, paragraph two of the syllabus. I cannot concur in the refusal of the majority to apply these principles to the case at

bar.

**{¶ 129}** We further recognized in *Ashworth* that a "trial court should be cognizant of actions on the part of the defendant that would call into question the defendant's competence." *Id*. at 62, 706 N.E.2d at 1237. In the penalty phase of a capital case, where the decision to be made is one of life and death, any indicium of incompetence should be explored to ensure that a defendant is capable of making a knowing and intelligent waiver of this critical right.

**{¶ 130}** In the case at bar the trial court should have ordered a competency hearing and expressly determined whether Jesse Cowans knowingly and voluntarily waived his right to present mitigating evidence. Cf. *State v. Ashworth*. Because these critical procedural safeguards were not employed in this capital case, I respectfully dissent.

I

Competency

**{¶ 131}** A defendant is mentally competent to forgo the presentation of mitigating evidence in the penalty phase of a capital case if (1) he has the mental capacity to understand the choice between life and death, (2) he has the mental capacity to make a knowing and intelligent decision not to pursue the presentation of evidence, (3) he fully comprehends the ramifications of his decision, and (4) he possesses the ability to reason logically and to choose means that relate logically to his ends. See *Ashworth*, paragraph two of the syllabus; *State v. Berry* (1996), 74 Ohio St.3d 1504, 659 N.E.2d 796.

**{¶ 132}** The majority cites *State v. Tyler* (1990), 50 Ohio St.3d at 29, 553 N.E.2d at 585, for the proposition that waiver of mitigation, in and of itself, does not call into question a capital defendant's competence. I concurred in *Tyler,* and now conclude that all capital defendants who instruct their counsel to waive mitigation should be evaluated for competency. Furthermore, I believe Cowans should have been examined for competency under the precedent established in

*Tyler* and *Ashworth.* That precedent, recognized by the majority, provides that a court must inquire into the competence of a capital defendant who decides to waive the right to present mitigation evidence, if some reason exists to question competence, other than the waiver decision itself.

{¶ 133} Cowans's circumstance is not one where the sole indicium of incompetence is that the capital defendant decided to waive mitigation. Rather, Cowans's behavior at trial, which the trial court acknowledged to be disruptive, combined with his apparently illogical choice to waive mitigation after having been found guilty, while never expressing a desire for imposition of the death penalty over life in prison, and all the while maintaining his innocence, should have alerted the trial court to the possibility that Cowans lacked competence to knowingly and voluntarily waive his right to present mitigation evidence.

{¶ 134} In *Tyler*, the defendant indicated to the jury that he would prefer a death sentence to life imprisonment. Acknowledging and accepting his fate, despite his protestation of innocence, Tyler told the jury that "to serve a life sentence 'for a murder that I didn't commit' would be as bad or worse than, death." *Tyler* at 27, 553 N.E.2d at 583. Tyler told the jury that whether or not they believed him to be guilty, "if it [*sic*] is any kindness in your heart at all, then you have got to still give me a death verdict, because life in the penitentiary is death." *Id*.

{¶ 135} The reasoned choice to waive mitigation made by Tyler is clearly distinguishable from the decision made by Cowans. Tyler fully realized that the presentation of mitigating evidence could potentially dissuade the jury from sentencing him to death. He chose not to present mitigating evidence precisely because he feared that the jury would consider the evidence and decide to sentence him to life in prison, a fate he considered worse than death.

{¶ 136} In contrast, Cowans never indicated that he would prefer a death sentence to life in prison. Rather, Cowans had a fixed and unshakable belief that any further participation in the sentencing or mitigation process would be

completely futile, as demonstrated repeatedly throughout the trial.

**{¶ 137}** During the reading of the verdict but before the jury left the courtroom, Cowans directed an outburst riddled with obscene language at the court and at the jury in which he repeatedly demanded to be removed from the courtroom. The court ordered that the defendant be taken into the court basement, to a room equipped with closed-circuit TV and sound, so that he could hear and see the remainder of the court proceedings. After the jurors completed reading the verdict forms and returned to the jury room, the court deputy approached the trial judge and reported under oath that Cowans had disabled the closed circuit TV set, including the sound, and was asking to be taken back to the jail.

**{¶ 138}** At the evidentiary hearing regarding the prior murder specification, Cowans again refused to be a part of the proceedings:

"Defense Counsel: * * * He has indicated he no longer wishes to be present in the courtroom for any proceedings. He doesn't want to be present for the evidentiary hearing * * *[,] he does not want to be present for the mitigation hearing, nor does he want to be present for sentencing. His reasoning as expressed to me, on the mitigation phase, is that it is inherently biased because the jury that's already found him guilty of 20 counts, that would be biased against him when it came to any mitigation. And therefore, he doesn't choose to participate in that phase of it. And also, since he has stated he believes that the process by which the recommendation of the jury is obtained and given to the court is biased, that he does not wish to participate in the sentencing. * * *

" * * *

"The Court: You do not wish to be present for this hearing?

"The Defendant: I don't want to be a part of none of this kangaroo * * *.

"The Court: All right. Sir, then at this point in time, we'll have him removed from the courtroom.

" * * *

32

"We'll put him downstairs at this stage.

" * * *

"The Defendant: No, no, no, don't man. What do I — * * * Man, what do I — I don't want to be a part of none of this s* * *, it's kangaroo.

"The Court: You have a right to hear what's going on, Mr. Cowans.

"The Defendant: I'm cool; I'm cool.

"The Court: Mr. Cowans, do you understand you have the right to a hearing?

"The Defendant: I don't want to be a part of none of your kangaroo court. I don't want to be nowhere in the courthouse.

" * * *

"The Court: All right. You have the right, sir, to participate in this hearing if you wish, sir.

"The Defendant: Yeah, kangaroo court."

{¶ 139} The court then put Cowans back into the room with closed-circuit TV and audio hookup. A few minutes later, Cowans's counsel informed the court that Cowans was requesting that the sound on the audio be turned down. He was refusing to watch, had his back to the screen, and was struggling with three deputies while demanding to be returned to the jail immediately.

{¶ 140} As demonstrated above, Cowans exhibited behaviors and beliefs that should have put the trial court on notice that Cowans's thinking might be less than rational. Cowans's disruptive behavior could have been a misguided protest against the criminal justice proceedings against him, grounded in rational thought. However, his behavior could also have been the result of mental instability. His outbursts demonstrate a potential inability to control his behavior and reveal a feeling of futility that could be produced from a mental disorder affecting his competency to execute a valid waiver.

{¶ 141} Moreover, the record demonstrates that Cowans repeatedly made

comments consistent with the unreasonable belief, approaching paranoia, that everyone involved in the trial was working against him. In addition to the comments previously quoted, which demonstrate an extreme distrust of the jury, the judge, and the prosecutor, Cowans exhibited an inflexible belief from the very beginning of his case that even his assigned counsel believed that he was guilty and that he had no real chance of getting a fair trial.

{¶ 142} Prior to the jury voir dire, Cowans asked that his first set of counsel be dismissed because they discussed plea-bargain options with him, and he expressed a fear that anyone else from that counsel's office would be controlled by the originally appointed counsel. Cowans told the court that appointing other counsel from the same office would be "just like hanging me, Your Honor, you might as well hang me."

{¶ 143} He continued his protests against assigned counsel saying, "[t]he reason I am coming at this, this man keeps pushing me to plea bargain. Now if you give me an attorney from his office, he will still be running the show behind the scenes. I think, you know, I beg the Court to at least think about that." Cowans's appointed counsel told that court that he hadn't even started to talk to Cowans about plea-bargain possibilities. Counsel stated, "I hadn't even said the words plea bargain. * * * I am more than willing to work with Mr. Cowans. I don't know, he obviously felt that I was trying to pressure him, but I certainly wasn't and I am more than happy to have him reject the plea bargain and go forward at trial."

{¶ 144} In an abundance of caution, the court decided to allow Cowans's motion to appoint new counsel, and Cowans proceeded to challenge the second set of counsel as well. Again, Cowans expressed a belief that counsel were working against him, trying to pressure him into pleading guilty to the murder.

"The Defendant: They want—they feel I am guilty, you know. I feel they can't represent me to best of their ability because they feel I am guilty.

" * * *

"The Defendant: It is not about liking them. They are wanting me to plead guilty and lie. * * *"

{¶ 145} Again, Cowans's counsel informed the court that Cowans's fears were unfounded. Counsel told the court that they had never advised Cowans that they thought he was guilty. "[W]e did what all attorneys do with clients, discuss evidence and discuss theories * * * and we have had some differences on approaches. But we have not said those things, nor have we ever asked Mr. Cowans to tell an untruth under oath or any other wise [*sic*]."

{¶ 146} When the court refused Cowans's second request to have counsel removed, Cowans appeared unable to accept the court's determination. He remained fixated on his belief that counsel was working against him and that his only hope was to have new counsel appointed. The court's attempts to move Cowans past that issue and onto other necessary matters was futile. Because Cowans was unresponsive with the court and would not give up the notion that he should have new counsel appointed, the trial court had him removed from the courtroom.

{¶ 147} A week later, when Cowans was returned to the courtroom for further proceedings, he continued to exhibit a fixation on the idea that his own counsel believed him to be guilty and were working against him. During this communication with the court, Cowans also indicated a belief that the prosecuting attorney was out to get him, that someone was laughing at him, and that the court itself was biased against him. His inappropriate behaviors escalated:

"The Defendant: Your Honor, prosecution is going to say stuff like that. They would rather me keep counsel that ain't going to be able to represent me to their fullest, because that would be in their benefit.

" * * *

"The Court: Mr. Cowans, let me advise you, again, sir, that you have the right to sit here and participate in this trial.

"The Defendant:  Participate how?  Participate in hanging me?

"The Court:  I just told you, Mr. Cowans.

" * * *

"The Defendant:  The man is going to laugh at me.

"The Court:  Did I just tell you before, not too long ago —

"The Defendant:  The man is going to laugh at me.

"The Court:  — you are leaving this Courtroom if you continue this?

"The Defendant:  The man is going to laugh at me.

"The Court:  If he laughs, sir, so what? So what if he laughs at you?

"The Defendant:  So, now, I see what it's really about.

"The Court:  At this point in time, sir, he shouldn't be laughing at you.  But the point of the matter is, you are not to react this way.

"The Defendant:  Why not?  I'm fighting for my life, man.

"The Court:  You are going to leave this courtroom if you keep it up, Mr. Cowans.

"The Defendant:  I want the Judge to tell me what I'm supposed to do now to get new counsel.  I want new counsel.  I don't want this man as my counsel.

"The Court:  Mr. Cowans, at this point in time, I'm indicating that this is the counsel that you are going to have to work with, sir.

"The Defendant:  So, what do we do now during trial?  I don't want this man as my counsel.  I don't want this man representing me in anything.  Now, what?

"The Court:  Do you wish to represent yourself, Mr. Cowans?

"The Defendant:  How?  I don't know s* * * about law.  How?

"The Court:  Then I suggest you cooperate.

"The Defendant:  Cooperate with a man that's trying to down me?  Come on, Your Honor.

"The Court:  You have Mr. Wallace, also, Mr. Cowans.

36

"The Defendant:  Yeah, okay.  I see what this is about.

"The Court:  Anything else?

"The Defendant:  Yeah.  I feel that you might as well be in their pocket. Are they paying you to down me or something?  Is the prosecution paying you, Your Honor?

"The Court:  Anything else?

"The Defendant:   Must be.

"The Court:  Do you have anything else you want to add about this motion, sir, before we leave?

"The Defendant:  I would like new counsel."

{¶ 148} Additionally, Cowans expressed his distrust of the woman who would have controlled the stun belt, which Cowans had the option of wearing rather than appearing before the jury in shackles.  Cowans told the court that he would not wear the belt if she was in control of it because he thought that she seemed to have a "personal problem" with him.

{¶ 149} The defendant's outbursts, fixations, and apparent feelings of persecution should have put the court on notice that there was a least a possibility that Cowans was incompetent to make a rational decision to waive mitigation. Expression of his beliefs could have been based on a rational attempt to control or manipulate the criminal proceedings.  They could also have been based on a mental disorder creating paranoia.

{¶ 150} In order to avoid the very argument raised by defendant in this appeal, the trial court should have ordered a competency hearing to determine whether, in fact, the defendant was competent to waive this essential right.  Because the record does not reveal that Cowans's decision to waive mitigation has a rational connection to any of his stated goals or choices, Cowans's competency to waive mitigation remains in question.

{¶ 151} The majority is satisfied with the trial court's evaluation that

Cowans evidenced "no mental instability but rather acted out his pique." My review of the record causes me to conclude that the conclusion of the trial court was not obvious from Cowans's conduct. Particularly where an accused may receive the penalty of death, trial courts should be most cautious in making their own conclusion regarding the competence of the defendant to make rational decisions regarding the trial of his or her own case.

**{¶ 152}** As has been demonstrated by an increasing number of cases in Ohio and nationwide, failing to conduct a timely competency hearing when a capital defendant desires to waive mitigation will likely lead only to more appeals, longer delays, and diminished confidence that the death penalty is being used only in truly appropriate cases. In addition to preserving the defendant's rights, the trial courts can promote judicial economy by avoiding foreseeable appeals, and can promote faith in the system, by making it a practice to order competency hearings whenever there is any indication that the defendant's competency to execute a knowing and voluntary waiver may be affected.

II

Knowing and Voluntary Waiver

**{¶ 153}** I agree with the majority that the colloquy requirements adopted in *Ashworth* should be strictly followed and that substantial compliance should not be deemed sufficient. This court has long recognized the mandatory nature of such procedural safeguards, and, in recent years, we have vacated the death sentence in two cases when the trial court failed to strictly adhere to procedural requirements: *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph one of the syllabus; and *State v. Green* (1998), 81 Ohio St.3d 100, 689 N.E.2d 556, syllabus.

**{¶ 154}** However, I also believe that these requirements should be applied not only prospectively but in all cases. The colloquy requirements outlined in *Ashworth* are procedural requirements this court deemed necessary to ensure that a waiver of mitigation has been made knowingly and intelligently.

{¶ 155} The trial court below made no determination on the record regarding Cowans's understanding and waiver of rights. Unlike the trial court in *Ashworth*, the trial court here failed to define "mitigating evidence," and the record does not indicate that Cowans fully understood the importance of mitigating evidence and its use to offset aggravating circumstances. Rather, the record shows that Cowans repeatedly agreed to whatever the court asked, often without even waiting until the statement was complete. This does not demonstrate an understanding of the importance of mitigation or of waiving the right to present any mitigating evidence.

{¶ 156} Further, the court did not fully outline the consequences of Cowans's decision to forgo the presentation of mitigating evidence. While the court did state that without mitigating evidence the jury would "probably" come back with a death penalty verdict, this does not adequately represent the significance of the waiver. As reflected in the jury instructions given by the court, a death penalty verdict was not only "probable" but required by law if aggravating circumstances existed and no mitigation was presented. See *Emerson v. Gramley* (C.A.7, 1996), 91 F.3d 898, 906.

{¶ 157} In *Ashworth,* there were several discussions between the trial court and the defendant regarding the mandatory nature of imposing the death penalty if no mitigation evidence was presented. Nothing in the record of this case, however, indicates that Cowans understood the compulsory nature of the jury instructions that would be presented in this regard.

{¶ 158} In order to fully understand the importance of mitigating evidence and its use to offset the aggravating circumstance(s), it is also necessary that the defendant understand the possible mitigation evidence available in his or her own case. *Id.*, 91 F.3d at 906. Defense counsel stated that they had discussed the issue with Cowans and that he had not arrived lightly at his decision; however, nothing in the record indicates that counsel fully explained the specific mitigating evidence

available to Cowans. The court should have inquired both of Cowans, and of defense counsel, whether counsel had explained the specific mitigating evidence available and whether Cowans understood how that evidence might offset the aggravating circumstances of the crime.

{¶ 159} Further, because of the specific concerns raised by this defendant on the record, the court should have explained that the jury, despite having found him guilty, was legally obligated to find that the death penalty was not appropriate if any mitigating evidence outweighed the aggravating circumstances. It may also have been helpful to specifically address that the state has the burden to prove, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors and that juries cannot legally recommend the death penalty solely because they find a defendant guilty of the underlying charges.

{¶ 160} The court made no findings of fact as to Cowans's understanding and waiver of rights, and the record in this case does not demonstrate that Cowans did, in fact, knowingly and voluntarily waive his rights to mitigation. Therefore, regardless of whether the specific procedural guidelines set forth in *Ashworth* are applied to this case or applied only prospectively, the record in this case does not indicate that Cowans knowingly and voluntarily waived his mitigation rights.

{¶ 161} Based on the foregoing reasons, I would hold that Cowans's competency to waive mitigation was never established, and his former waiver is therefore void. In addition, even if Cowans had been deemed competent to waive mitigation, the record does not establish that Cowans's waiver was knowing and intelligent. Therefore, I would affirm his conviction, but would reverse the death sentence and remand for resentencing.

—————————————