OPINION
Defendant, Steven S. Brown, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of aggravated robbery and two counts of aggravated murder.
On March 12, 2000, at about 4:00 p.m., Howard Wolman drove to meet his cousin, Irv Miller, at his home. When Wolman arrived, he noticed that the side door of Miller's house was unlocked. In light of this unusual discovery, Wolman walked inside and found Miller laying on the floor. Miller's body and the surrounding area were soaked with blood. Wolman immediately ran to a neighbor's home where police and emergency medical personnel were summoned. Miller was pronounced dead at the scene.
During the course of their investigation, police discovered that Miller's home had been robbed and that his Jeep Cherokee was missing. Later that same day, Eric Miller, who is not related to the decedent, observed the defendant, Steven S. Brown, park Irv Miller's Jeep in an alley behind an abandoned house next to his at 423 St. Clair Avenue. Eric Miller paid special attention to the defendant because "nobody is supposed to be there * * *." (Tr. Vol. VIII, p. 65.)
At trial, Eric Miller testified that upon being noticed, the defendant approached and claimed that he had locked his keys in his Jeep. Defendant asked Miller if he had a coat hanger. Miller replied that he did not, and the defendant left and went inside the abandoned home. A short while later, Miller watched the defendant smash one of the Jeep's windows. When approached by the police, Miller picked the defendant from a photographic array, a fact he confirmed at trial.
David Mayo, a friend of the defendant, testified at trial that he met the defendant in an alley off of St. Clair Avenue between three and four o'clock on the day of the murder and that the defendant removed a set of golf clubs from Miller's Jeep. According to Mayo, the defendant told him that he needed money, gave him the clubs, and asked Mayo to sell them for him. Mayo took the clubs and put them in his basement. At trial, he testified that he later called the police and returned the clubs.
Detectives located Miller's stolen Jeep shortly after receiving information that the defendant had parked it off of St. Clair Avenue. After recovering the vehicle, the police cornered the defendant in the abandoned house. He was ultimately taken into custody and was transported to Grant Hospital for treatment of a few minor injuries. While at the hospital, detectives collected physical evidence from the defendant, including clothing, shoes, and blood.
The defendant was interviewed by police at the hospital; however, at that time he denied any knowledge or involvement in causing Miller's death. Nevertheless, he was very curious about the details of the crime, and asked what evidence the police had against him.
At his own request, defendant was re-interviewed a few days later while incarcerated in the Franklin County Jail. The detective who first interviewed the defendant was present, as was Officer Brian Holbrook, who is related to the defendant by marriage. During the course of the second interview, defendant admitted that he walked to Miller's home on the day of Miller's murder, and was allowed to enter. According to the defendant, he told Miller that he had just been released from the Maryhaven treatment center, and asked if he could borrow twenty dollars. The two purportedly began to argue about the defendant's drug abuse and theft. Defendant admitted that during that argument he fabricated an accusation that Miller had sexually abused his daughter. At that point, defendant claims that Miller picked up two kitchen knives and came toward him. Defendant then claimed that Miller was "somehow" killed during the struggle which ensued. The defendant explained that after Miller had been killed, he took the knives and placed them in the kitchen sink. He then searched Miller's home for money and the keys to his automobile. Finding both, he fled the scene and went into hiding in an abandoned house.
At the crime scene, officers found two knives in the kitchen sink, as well as a knife handle and broken blade on the kitchen floor. All were covered with Miller's blood. An examination of Miller's body revealed that he had been stabbed at least ten times and that two of those stab wounds could have independently caused his death. Specifically, Miller had a six-inch stab wound in the middle of his neck which entered from the front of the neck, severed his esophagus, larynx, and left carotid artery. He also suffered a five-inch stab wound to his chest which punctured his left lung. In addition to these major stab wounds, Miller suffered a three-inch stab wound in his back which punctured a kidney, several smaller stab wounds, four incised wounds, two lacerations, and multiple abrasions. Small quantities of the defendant's blood were found in the kitchen, an upstairs bathroom, in the master bedroom, and on an office drawer. Finally, defendant's footprints were found in Miller's blood in the kitchen.
On March 22, 2000, defendant was charged with one count of aggravated robbery and two counts of aggravated murder. Each count of aggravated murder contained a death specification.
Following arraignment, the trial court appointed two attorneys to represent the defendant. The defendant initially expressed a desire to plead guilty to the charges and to waive mitigation. However, at the request of defense counsel, the trial court ordered a competency hearing in order to determine whether the defendant was competent to plead, waive mitigation, and/or stand trial. Although depression and a chronic substance abuse problem were noted, the examining physician testified that the defendant was capable of understanding the charges and proceedings against him, that he was capable in assisting in his own defense, and that he fully comprehended the ramifications of a decision to waive mitigation. Accordingly, the trial court found that the defendant was competent to either waive mitigation or stand trial.
After the competency hearing, the trial court noted that the case was scheduled for trial on March 23, 2001, but that a hearing date on March 5, 2001, had been set aside if the defendant still wished to plead guilty. At this time, the trial court was already aware of the defendant's dissatisfaction with his appointed counsel, a fact that the defendant reaffirmed, stating that he wished to proceed without counsel. When asked to explain why he desired to dismiss counsel, defendant stated, "[w]e just have different approaches to what result is wanted, and they won't do what I want, plus they don't want to be responsible for having someone on death row, and I don't want to have them responsible for that on their conscience." (Tr. Vol. I, p. 39.)
The trial court proceeded to discuss the matter at some length with the defendant, stating that if counsel were allowed to continue their representation, and if the defendant pled guilty, that counsel could not "very much interfere with that very effectively, can they * * *?" (Tr. Vol. I, p. 40.) Defendant finally responded, "[w]ell, I don't want them trying to talk me out of it. I don't want any contact with them. It is my decision. * * * I don't want them as my attorneys." Id. At this time, the trial court denied the defendant's request, stating that it was going to have counsel remain and be present with the defendant at the plea hearing, and that it would revisit the issue at that time. The defendant then presented the court with a waiver of his right to be tried by a jury, electing to be tried by a three-judge panel.
On February 28, 2001, the defendant came before a three-judge panel in order to determine whether he still wanted to proceed pro se. The court again asked the defendant whether he remained steadfast in his desire to dismiss counsel. At this time, defendant responded that he wished to be represented, but that he did not want to proceed with currently assigned counsel. He explained at length that he was not satisfied with current counsels' performance, specifically noting that they had not gathered or analyzed evidence which he believed was crucial to the presentation of a defense. He explained that he had earlier wished to plead guilty and waive mitigation because he did not believe that he had any chance at trial.
The trial court next addressed defense counsel, who explained that some, but not all investigation had been completed. Counsel stated that they believed that there was sufficient time prior to trial to properly prepare defendant's case, as well as to address the specific concerns raised by the defendant. They also candidly admitted that the relationship had been an "uncomfortable" one. The court then explained to the defendant that if new counsel were appointed, a continuance would be necessary in order to allow new counsel time to prepare, to which the defendant responded that he would be willing to accept. The court took that matter into consideration, and after a short recess returned, finding that the actions taken by appointed counsel had been reasonable. It therefore denied defendant's request for new counsel. The defendant then stated that he would rather proceed pro se than with current counsel. The court responded, "[b]ased on the amount of work that is left to be done at this time, once again, Mr. Brown, your request to go pro se is denied and will be reconsidered by the court on your trial date of March 23 if, in fact, that is how you still wish to proceed at that time." (Tr. Vol. II, p. 16.) The court concluded, specifically explaining that appointed counsel should ask for a further continuance if necessary to prepare for trial.
Defendant's trial commenced on March 23, 2001. At this time, the defendant again stated that he wished to proceed pro se, but was initially rebuffed by the court, which chose first to address the pretrial motions filed by defense counsel. After those motions had been ruled upon, the court and the defendant engaged in an extensive dialogue. During the course of that dialogue the defendant again stated his dissatisfaction with appointed counsel, at one point stating:
 * * * I am saying that my lawyers don't want the story to come out. Whether it is bad or good, it makes no difference to me, and I want the story to be told as it happened. I just want the truth to come out. That's all I want. I have had to fight for every piece of evidence since December 5, everything. I mean, we have been yelling at each other. We can't get along. I don't want these people as my attorneys. * * * [Tr. Vol. III, p. 50.]
The defendant also set forth a list of detailed and specific complaints he had with appointed counsel, centering primarily around their preparedness for trial and their failure to collect and analyze DNA evidence. Responding to defendant's complaints, defense counsel stated that "[t]he basic problem is that Mr. Brown wants to proceed and handle the case in a certain fashion, and [we] disagree with that, and we intend to proceed in the manner we see fit." (Tr. Vol. III, p. 48.)
At the conclusion of this lengthy discussion, the trial court again denied the defendant's request for new counsel. The court then returned to the issue of defendant's request to proceed pro se. In doing so, the court explained:
 In taking into consideration in total the defendant's reason for wanting counsel, his rights under which I, frankly, disagree, Faretta versus California says that he has a right to proceed pro se if the court finds that he has been fully advised of the potential consequences of such a decision. And in this case the court has been on the record ad nauseam about how prepared his lawyers are to proceed on his behalf. He is fully aware of the seriousness of the offenses, and that he is proceeding he would be proceeding pro se, and the court finds that he is making this decision freely, voluntarily, being fully aware of counsel being seated right next to him at this time, and the court finds that the defendant has knowingly and voluntarily waived his right to counsel and will be permitted to represent himself. [Tr. Vol. III, pp. 62-63.]
Having finally ruled upon his motion, the defendant then stated that he was not prepared for trial or the pending motion to suppress because he had not been given access to the motion and had only been granted permission to represent himself that very moment. He further argued that he had requested permission to proceed pro se on January 31, 2001, and that if granted at that time, he would have been prepared. However, the court, on several occasions, delayed ruling upon his request until the day of trial, leaving him no opportunity to develop the evidence which he believed was crucial to his defense. The court responded stating: "You are going to proceed to trial today, sir." (Tr. Vol. III, p. 65.)
Defendant renewed his request for a continuance on several different occasions, noting that he had no opportunity to bring the witnesses he wished to testify, nor did he have the opportunity to gather the DNA evidence which had just been tested. However, the trial proceeded, and the defendant was convicted as charged. Defendant now appeals raising the following six assignments of error:
 [1.] The trial court erred when it denied Appellant Brown's request for new trial counsel thereby violating Appellant Brown's state and federal constitutional rights to counsel and due process of law. Sixth and Fourteenth Amendments to the United States Constitution; Sections 10 and 16, Article I of the Ohio Constitution.
 [2.] The trial court erred when it refused to grant Appellant Brown a short continuance to enable him to prepare his defense for trial and proceed pro se. The trial court's error was an abuse of discretion and deprived appellant of his constitutional right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
 [3.] Appellant Brown was deprived of his right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution when the trial court failed to properly inquire into whether Mr. Brown knowingly, intelligently, and voluntarily waived his right to counsel and whether he knowingly, intelligently, and voluntarily asserted his right to self-representation.
 [4.] The trial court erred when it failed to instruct the jury that the elements of aggravated robbery must occur simultaneously. This error violated Appellant Brown's constitutional rights to the due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 16
of the Ohio Constitution.
 [5.] The state failed to introduce sufficient evidence to sustain Appellant Brown's convictions for aggravated robbery, aggravated murder (felony-murder theory — Count 1), and the death specifications. Therefore, Appellant Brown was deprived of his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article 1, Section 16 of the Ohio Constitution.
 [6.] The state failed to introduce sufficient evidence to prove the element of prior calculation and design necessary to sustain a conviction for aggravated murder pursuant to R.C. 2903.01(A) beyond a reasonable doubt. Therefore, Appellant Brown was deprived of his right to due process of law under the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution.
Section 10, Article I of the Ohio Constitution and the Sixth andFourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to the effective assistance of counsel. The right to the effective assistance of counsel does not guarantee a defendant an easy "rapport" or a "meaningful relationship" with his or her appointed counsel. Morris v. Slappy (1983), 461 U.S. 1, 13-14,103 S.Ct. 1610. Stated alternatively, the right is a right to professionally competent, effective representation. Thus, in order to discharge a court-appointed attorney, a defendant must demonstrate a significant breakdown in the attorney-client relationship — one of such magnitude so as to jeopardize the defendant's right to professionally competent, effective representation. See State v. Coleman (1988),37 Ohio St.3d 286, paragraph four of the syllabus.
In this case, defendant faces the most serious punishment Ohio law provides, and the record reflects from the beginning that the defendant was at odds with his appointed counsel regarding trial strategy, what defense should be pursued, as well as to what investigation needed to be done. Defendant consistently and repeatedly complained to the trial court that counsel was not diligently pursuing their investigation or the preparation of his defense. Indeed, defense counsel stated very early in this proceeding that:
 It has, obviously, been an uncomfortable situation to represent someone that early that is dissatisfied with your services. Whether that's a rightly or wrongly held view, I don't know how relevant that is and, obviously, the stakes being what they are here, it would be the best situation for him to have counsel that he feels comfortable with. * * * [Tr. Vol. II, p. 5.]
It is readily apparent from the record that the defendant did not trust his counsel, a fact that was confirmed by counsel. It is also apparent that the relationship and ability to communicate between the defendant and defense counsel deteriorated rather than improved as this proceeding progressed. Throughout the pretrial proceedings, defendant continued to express his dissatisfaction with trial counsel and continued to request new counsel. He repeatedly explained to the court that he would rather proceed pro se than to continue with appointed counsel. Defendant's complaints remained constant throughout. At one point, defendant explained that he had earlier wished to plead guilty and waive mitigation because he "didn't feel [he] had any chance at trial," because his attorneys had done nothing; "so rather than spend 25 years in prison, I would rather get the death penalty." (Tr. Vol. II, p. 3.)
The defendant brought his concerns to the attention of the three-judge panel on February 28, 2001, and again asked for new counsel because he was not satisfied with their performance. Specifically, defendant explained that counsel had not gathered evidence which he believed was critical to his defense, and showed no inclination to do so. The defendant went on, setting forth specific complaints with counsel, among those being that "[t]he whole theory of our case was self defense, and I have already admitted and talked to the police, but I was cut at the scene, blood all over the place. * * * The evidence was collected but it wasn't processed. I asked them to collect that or try to get that evidence, and they didn't." (Tr. Vol. II, pp. 8-9.) Defendant further complained that counsel had not spoken with or even contacted witnesses, had not investigated his past history of drug abuse, and had not done any investigation concerning the interaction of the various drugs that he had taken just prior to Miller's murder. Defendant also claimed that counsel had not been to Maryhaven to talk with his doctors, had not requested a toxicologist, did not plan to visit the crime scene, and did not investigate discrepancies in the coroner's report.
The defendant placed more emphasis, however, on the blood evidence that had been collected at the scene of the crime, but which had not been tested by the state. Although numerous blood samples had been collected at the crime scene, only a small portion had actually been tested. Those that had been tested only confirmed the presence of Miller's blood. However, defendant claimed that he had been cut while fighting with Miller and wanted additional samples tested to corroborate this claim. On more than one occasion, defense counsel admitted that they had not requested additional testing. When questioned, counsel stated that "we feel * * * that we have adequately investigated this case in the fashion that we wish to proceed and handle the trial. We feel that we have interviewed enough witnesses, sufficient witnesses in order to accomplish the goals that we wished to accomplish at trial and, more importantly, the method of the way we wished to proceed at trial." (Tr. Vol. III, p. 47.) Shortly thereafter, the trial court responded:
 The Court: I fully understand what [defense counsel] said, * * * which is not what you told the court last week. You told the court you were going to try this case the way he [the defendant] wanted it, and you had a whole list of witnesses to turn over, and you thought you had a duty to try it the way he wanted. So you are saying you are not following your duty?
 [DEFENSE COUNSEL]: No, Your Honor, I am saying that Mr. Ketcham and I have decided that as lawyers, if we remain the lawyers on the case, that it is our ethical responsibility to proceed in a manner that we see is in Mr. Brown's best interest. * * *
 THE COURT: Despite having a full week to prepare in that way, because, Mr. Nowland, this is not what you represented to the Court on Monday.
 [DEFENSE COUNSEL]: On Monday, I believe I stated that should we proceed at that point, we probably were proceeding in the manner that Mr. Brown wished to proceed and pursue those issues.
 THE COURT: Correct. You were told by the court to turn over witness information that you had in that regard. Are you telling me you did not do that?
 [DEFENSE COUNSEL]: No, we turned over witnesses in the manner that now we are — in the manner we wish to proceed. * * * [Tr. Vol. III, pp. 56-58.]
The court finally concluded stating "[w]ouldn't the safe and prudent thing to have done would be to do what the court told you on Monday, which is to turn [over a list of] all of the witnesses that Mr. Brown wanted called * * *." Id.
Authority certainly exists for the proposition that a complete or substantial breakdown in communication between a defendant and appointed counsel can constitute good cause for substitution. State v. Cowans (1999), 87 Ohio St.3d 68. Authority also exists which provides that defendant may decide what evidence, if any, to present at a mitigation hearing and may decide to present no evidence at all, even against the advice of his counsel. State v. Tyler (1990), 50 Ohio St.3d 24.
In this case, the record is replete with examples showing the inability of the defendant and defense counsel to communicate and to work together, beginning with the defendant's initial decision to plead guilty and to waive mitigation. Indeed, starting almost immediately after his arraignment, the record also shows that the defendant and appointed counsel were at polar opposites as to how to proceed. The defendant was consistently vocal about his specific complaints with counsel from the beginning, and we see no indication that his request for new counsel was made in order to hamper, hinder, or delay the court's proceedings. As such, we believe the court's refusal to reassign counsel was unreasonable. See State v. Deal (1969), 17 Ohio St.2d 17, syllabus. We therefore sustain the defendant's first assignment of error.
We also find merit in the defendant's second assignment of error. Therein, defendant claims the trial court acted unreasonably when it postponed ruling upon his request to proceed pro se until the day of trial, and then refused to grant him any continuance in order to prepare. As noted above, defendant was adamant about his desire to have the court appoint new counsel to represent him in this matter. He was also equally steadfast and vocal that he wished to represent himself if the court refused to appoint new counsel. While the trial court was not required to grant the defendant's motion to represent himself, having done so, we find it unreasonable to deny the defendant any amount of time to prepare his defense.
The grant or denial of a continuance is a matter entrusted to the discretion of the trial court. As such, an appellate court should not reverse the denial of a continuance unless there has been an abuse of discretion. Ungar v. Sarafite (1964), 376 U.S. 575, 589, 84 S.Ct. 841; State v. Bayless (1976), 48 Ohio St.2d 73. As the United States Supreme Court stated in Ungar: "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. at 589. To that end, the Supreme Court explained that when considering a motion for a continuance, a court should evaluate the length of the delay requested, whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court, whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived, whether the defendant contributed to the circumstance which gives rise to the request for a continuance, as well as other relevant factors which depend upon the unique facts of each case. Id.
After carefully examining the record in this case, we believe that the trial court's denial of a continuance under the circumstances was unreasonable. In this case, the defendant did not ask for a lengthy delay, only enough time to test and gather the blood evidence and medical records, and to subpoena the witnesses he wished to call at trial. There is also no indication in the record, from the trial court or prosecution, that a short continuance would have prejudiced the prosecution's case, or inconvenienced the court. Finally, there is no indication, and there was no finding that defendant's request for a continuance was contrived or otherwise improper. As such, we also sustain defendant's second assignment of error.
Having sustained defendant's first and second assignments of error, the third, fourth, fifth and sixth assignments of error are moot. The judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
BRYANT and PAINTER, JJ., concur.
PAINTER, J., of the First Appellate District, sitting by assignment in the Tenth Appellate District.