OPINION
{¶ 1} Appellant, Aaron M. Kelly ("appellant"), filed this appeal seeking reversal of a judgment by the Franklin County Court of Common Pleas convicting him of murder and tampering with evidence. For the reasons that follow, we affirm the trial court's judgment.
 {¶ 2} Prior to June 2006, appellant was residing in a house located on Silverleaf Avenue in Reynoldsburg with his father, Gregory Kelly ("Mr. Kelly"), and his stepmother, *Page 2 
Kathy Rickman Kelly ("Mrs. Kelly"). Appellant was one of three children Mr. Kelly had from a prior marriage. When Mr. and Mrs. Kelly were married in 2000, they initially lived in an apartment, along with appellant and Mrs. Kelly's daughter from a prior marriage, Lacy Rickman. After appellant graduated from high school, the four moved into the Silverleaf Avenue house.
 {¶ 3} Over the next few years, appellant would move out of the house for periods of time, and then would move back in with Mr. and Mrs. Kelly. The most recent return occurred in December 2005. At that time, Mrs. Kelly's daughter, Lacy, was attending college and no longer lived in the house. Due to her discomfort with appellant, Mrs. Kelly insisted that appellant and Mr. Kelly sleep in one bedroom while she slept in another. Mrs. Kelly also required that appellant leave the house whenever she was present if Mr. Kelly was not also present. Mrs. Kelly described Mr. Kelly as appellant's only friend. Mr. Kelly would take appellant out drinking with him, and would occasionally give him money.
 {¶ 4} On June 1, 2006, Mrs. Kelly accompanied her cousin, James Winston (known as Tommy), on a trip to Chattanooga, Tennessee for the weekend. When Mrs. Kelly and Tommy returned the following Monday, June 5, they found the garage door to the house open, and Mr. Kelly's black Hyundai Sonata was missing. Mrs. Kelly entered the master bedroom and found Mr. Kelly's dead body lying facedown in the closet. Mr. Kelly was nude, and both of his arms had been removed from his body and taken from the house.
 {¶ 5} Mrs. Kelly called 911, and Reynoldsburg police officers arrived at the scene shortly thereafter. After confirming that there were no other people in the house, the officers sealed the scene and began the process of obtaining a search warrant for the *Page 3 
house so they could conduct the investigation of Mr. Kelly's murder. In the closet next to Mr. Kelly's body were some bloodstained clothing and a broken knife with the blade and handle in separate pieces.
 {¶ 6} Earlier in the day of June 5, Trooper Matthew Whims ("Whims") of the Ohio State Highway Patrol was dispatched on a call regarding an individual who had been seen walking along I-71 in Morrow County. The report stated that the individual had been seen walking northbound on the southbound side of the highway. Before he could reach the scene, Whims was told to disregard the dispatch regarding the individual walking on the highway, and was instead dispatched to an unrelated traffic accident. While on his way to that scene, Whims saw the individual who had been the subject of the first dispatch walking southbound on the northbound side of the highway.
 {¶ 7} After finishing his duties at the scene of the traffic accident, Whims decided to check on the individual he had seen walking along the highway. On his way there, Whims stopped to assist with a disabled vehicle, which he followed to an exit ramp. While doing that, Whims saw another disabled vehicle stopped on the side of the highway at around mile post 139. He checked the license plate number of that vehicle through the computer in his vehicle, and the check revealed that the vehicle was registered in Mr. Kelly's name.
 {¶ 8} Whims then began once again to look for the person he had seen walking along the highway. He saw the person again, this time walking northbound on the southbound side of the highway. Whims approached the person, who Whims identified in court as appellant, and began to talk to him. Appellant initially told Whims his name was Shaud Anderson, but could not provide any identification. Appellant told Whims he had *Page 4 
been riding to Mansfield with a friend when they had a fight, resulting in appellant being thrown out of his friend's car and left by the side of the road. Whims testified that at this time, appellant had mud on his clothes and looked like he had been in a scuffle.
 {¶ 9} A check on the computer system revealed no person by the name Shaud Anderson. Whims testified that appellant was acting very nervous, to the point that Whims felt uneasy about appellant's behavior. Whims then consulted with his supervisor, who told him he could either arrest appellant on the minor misdemeanor charge of walking along the interstate due to the failure to provide identification, or he could give appellant a ride to the next exit. Whims drove appellant to a truck stop at the Route 95 exit from I-71 and left him there.
 {¶ 10} At around 3:00 that afternoon, John Falk, who owns a farm near the truck stop at the Route 95 exit, was working outside when he saw a person who he later identified as appellant approaching him from a creek on his property that runs under I-71. Falk testified that appellant told him his clothes were missing, and asked if Falk could give him some clothes. When Falk said no, appellant asked permission to proceed through Falk's property and out to the county road. During a subsequent search of the area around and in the creek, police found clothing and shoes.
 {¶ 11} Trooper Coby Holloway ("Holloway") of the State Highway Patrol was assigned to patrol I-71 in Morrow County on the following shift. Holloway was not aware of Whims' earlier involvement. Holloway testified that he saw the same vehicle Whims had seen stopped near mile post 139. Holloway stopped to check the vehicle and saw that the windows were down and the keys were still in the ignition. He also checked the license plate through the computer system. *Page 5 
 {¶ 12} While handling other unrelated matters, Holloway heard over the radio a report dispatching another trooper regarding an individual walking along the highway, and that the other trooper had been unable to locate the subject of the report. Holloway was then dispatched on another report regarding someone walking along the highway, but was unable to respond immediately. About two hours later, Holloway received yet another dispatch about someone walking along the highway.
 {¶ 13} Holloway found the person who was the subject of the report, who he identified in court as appellant, around mile post 154, and approached him along with another trooper. At that point, appellant was wearing only a pair of dark-colored boxer shorts, and had muddy feet and bloody scratches on his body. Upon being approached, appellant appeared to be indicating that he was deaf and mute. Eventually, appellant revealed that he was not deaf and mute, and began talking to the troopers. Appellant stated that his name was Shaud Anderson, and gave the troopers a birthdate and social security number. None of the information provided by appellant returned any match in the system.
 {¶ 14} Appellant initially told the troopers he had been in a fight that resulted in him being dropped off by the side of the highway. After being asked where his clothes were, appellant stated that he had been taking a shower at the truck stop when someone stole his clothes. Ultimately, Holloway told appellant he was being placed under arrest, at which point appellant simply placed his hands behind his back with no further protest. Appellant was then transported to the Morrow County Jail.
 {¶ 15} Sergeant Justin Hurlbert ("Hurlbert") of the State Highway Patrol also testified. At the time of the events in question, Hurlbert was a trooper assigned to the *Page 6 
Mount Gilead post. Hurlbert had spoken to Holloway while Holloway was dealing with appellant, and then came to work on the shift following Holloway's. While patrolling along I-71, Hurlbert saw the disabled vehicle that had been seen earlier by Whims and Holloway near mile post 139. Hurlbert identified the vehicle as a black Hyundai Sonata. Hurlbert checked the vehicle and also saw that the windows were down and the keys were in the ignition. Hurlbert also testified that in the back seat of the vehicle was a green plastic tote.
 {¶ 16} Hurlbert ultimately returned to the Mount Gilead post. By that time, the Reynoldsburg Police Department had issued a statewide alert asking law enforcement officers to be on the watch for Mr. Kelly's black Hyundai Sonata, and to be on watch for appellant. Reynoldsburg police were contacted, and Hurlbert returned to where the Sonata was parked and waited with it until Reynoldsburg police towed it away. The vehicle was returned to Reynoldsburg, where police conducted a search pursuant to a search warrant that had been obtained. During the search, the green plastic tote was opened, and Mr. Kelly's arms were found inside, along with articles of clothing and a knife with blood on it.
 {¶ 17} Detective Bill Early ("Early") of the Reynoldsburg police went to the Morrow County jail to interview appellant. Although appellant had continued to give his name as Shaud Anderson, Early was able to identify appellant through the use of his photograph on file with the Bureau of Motor Vehicles and through a tattoo on appellant's right shoulder. Early asked appellant to provide biological samples for testing, but appellant declined to consent. After obtaining a search warrant, Early was able to collect hair, *Page 7 
fingernail clippings, and a cheek swab from appellant. Early also took a photograph of appellant, which showed scratches and marks on appellant's body.
 {¶ 18} Appellant was indicted by the Franklin County Grand Jury on four charges. Count 1 charged appellant with aggravated murder based on prior calculation and design. Count 2 charged appellant with aggravated murder based on the commission or attempt to commit aggravated robbery, a felony. Count 3 charged appellant with murder. Count 4 charged appellant with tampering with evidence.
 {¶ 19} At a hearing held on the initial trial date of August 6, 2006, appellant's counsel requested a continuance of the trial date so a competency evaluation could be conducted. At that hearing, appellant's counsel told the trial court that appellant had continued to insist that his name was Shaud Anderson. Appellant was able to respond to questions from the trial court regarding his understanding of the charges against him, and agreed to sign the continuance entry as Shaud Anderson.
 {¶ 20} On October 16, 2006, the trial court held another hearing to consider the findings of the competency evaluation. Both parties stipulated to the contents of the report, which essentially stated that appellant had failed to cooperate with the evaluation. The trial court ordered that appellant be remanded to the Moritz Unit of the Twin Valley Behavioral Healthcare facility for further evaluation.
 {¶ 21} On December 13, 2006, another hearing was held to further consider the issue of appellant's competency. The parties stipulated to the report prepared by Dr. Jaime Lai. In the report, Dr. Lai gave the opinion that appellant was capable of understanding the nature of the proceedings, he was not presently capable of assisting with his own defense. The trial court found by a preponderance of the evidence that *Page 8 
appellant was not competent to assist with his defense, and ordered appellant to be committed to Twin Valley Behavioral Healthcare so he could be treated and restored to competency.
 {¶ 22} On March 22, 2007, the trial court held a hearing for the purpose of considering a report prepared by Dr. John Tilley, to which the parties stipulated. In the report, Dr. Tilley concluded that appellant had been restored to competency. The report stated that, while appellant initially continued to identify himself as Shaud Anderson, after a time he started identifying himself by his proper name. The report concluded that his insistence on identifying himself as Shaud Anderson was the result of either malingering for the purpose of manipulating his criminal case, or was the result of an unspecified psychosis that had gone into remission, with the first possibility deemed the more likely cause. (March 7, 2008 report, at 8.) The report also stated that appellant properly understood the nature of the criminal proceedings, and that he had not experienced any difficulties in dealing with his attorney. (March 7, 2008 report, at 7.) On motion of appellant's counsel, the trial court ordered that appellant be evaluated for the purposes of raising the defense of not guilty by reason of insanity ("NGRI"). The trial court ordered appellant held in the Franklin County Jail pending trial.
 {¶ 23} The case was scheduled for trial on July 9, 2007. On that date, the trial court held a hearing to consider the results of the NGRI evaluation. The report prepared by Dr. Lai indicated that upon being told the purpose of the evaluation, appellant stated that he was not interested and had left the evaluation room. The trial court also indicated that another evaluation that was to have been performed by Dr. Chris Haskins was also *Page 9 
unsuccessful. The trial court continued the trial date and ordered appellant to be sent back to Twin Valley Behavioral Healthcare for further evaluation.
 {¶ 24} Another hearing was held on August 8, 2007, regarding appellant's cooperation in the NGRI evaluation. The trial court indicated that appellant had continued to refuse to cooperate with the evaluation. The trial court stated, "One cannot help considering all of my past observations of this Defendant and the reading of the reports think that the Defendant is doing anything other at this point than malingering. At least that is certainly the impression I've received from reading the reports and observing him here in court." (Tr. I, at 30.) The court then held a telephone conference with Dr. Tilley, in which Dr. Tilley stated that in his opinion, appellant was refusing to cooperate with the evaluation of his own volition, and not because he was incapable of cooperating due to mental illness. At the conclusion of the hearing, appellant's counsel indicated that she had been unable to communicate with appellant regarding the strategy to be followed at trial due to appellant's refusal to speak to her or otherwise express his wishes to her, and that she felt ineffective in her representation of appellant as a result.
 {¶ 25} The case was set for trial on August 27, 2007. On that date, appellant's counsel expressed her continuing concern regarding appellant's competency. Counsel informed the trial court that appellant had continued to refuse to cooperate with preparation for the trial. The trial court reviewed the evaluation reports that had been prepared and quoted a number of the conclusions contained therein generally concluding that appellant was competent to stand trial. On the date the jury trial started, appellant's counsel informed the court that appellant had directed her not to pursue an NGRI defense, and that this was against her advice. *Page 10 
 {¶ 26} The case proceeded to trial, and the jury returned verdicts of not guilty of aggravated murder as charged in Count 1 of the indictment, but guilty of the lesser included offense of murder; not guilty of aggravated murder as charged in Count 2 of the indictment, but guilty of the lesser-included offense of murder; guilty of murder as charged in Count 3 of the indictment; and guilty of tampering with evidence as charged in Count 4 of the indictment. The three murder convictions merged for purposes of sentencing, and the trial court sentenced appellant to a term of incarceration of 15 years to life on the murder convictions, and a term of five years on the tampering with evidence conviction, with the sentences to be served consecutively, for a total term of incarceration of 20 years to life.
 {¶ 27} Appellant filed this appeal, asserting three assignments of error:
 ASSIGNMENT OF ERROR NUMBER ONE
 THE TRIAL COURT ERRED WHEN IT FAILED TO ORDER A COMPETENCY EVALUATION OR HOLD AN EVIDENTIARY HEARING ON THE DEFENDANT'S COMPETENCY WHEN THE RECORD CLEARLY DEMONSTRATED THAT THE DEFENDANT WOULD NOT TALK ABOUT HIS CASE OR ASSIST COUNSEL IN HIS DEFENSE AND IT APPEARED THAT THE DEFENDANT, HAVING PREVIOUSLY BEEN DECLARED INCOMPETENT, HAD EITHER RELAPSED OR HAD ERRONEOUSLY BEEN DETERMINED TO HAVE BEEN COMPETENT TO STAND TRIAL.
 ASSIGNMENT OF ERROR NUMBER TWO
 THE TRIAL COURT ERRED WHEN IT NEGLECTED TO MAINTAIN THE DEFENDANT'S EVALUATIONS OF HIS COMPETENCY AND RECORDS REGARDING THE ATTEMPTS TO EVALUATE HIS SANITY AT THE TIME OF THE OFFENSE AS PART OF THE RECORD IN THIS CASE. *Page 11 
 ASSIGNMENT OF ERROR NUMBER THREE
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF TAMPERING WITH EVIDENCE WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ALL OF THE REQUIRED ELEMENTS OF THE OFFENSE.
 {¶ 28} Initially, we note that appellant's second assignment of error has been addressed. On May 12, 2008, the state filed a motion for leave to supplement the record by filing the competency evaluation reports in question, which was granted. Consequently, the competency evaluation reports have been made part of the record for our review. Therefore, appellant's second assignment of error is overruled as moot.
 {¶ 29} In his first assignment of error, appellant argues that the trial court erred by failing to either order an additional competency evaluation or hold an evidentiary hearing when facts and circumstances indicated that appellant had either relapsed into incompetency or had erroneously been deemed to have been restored to competency. Under R.C. 2945.37(G), all defendants are presumed competent to stand trial unless, after holding a hearing, the court finds by a preponderance of the evidence that the defendant is incapable of understanding the nature of the proceedings or of assisting with the defense. If competency is raised prior to the commencement of trial, the court is required to hold a hearing on the issue, but the issue is not raised until after the commencement of trial, a hearing is required only for good cause shown or on the court's own motion. R.C. 2945.37(B). *Page 12 
 {¶ 30} A trial court's finding that a defendant is competent to stand trial where there is reliable and credible evidence to support that finding will not be disturbed on appeal because deference must be given to the trial court's ability to see and hear what goes on in a courtroom. State v. Were, 118 Ohio St.3d 448, 2008-Ohio-2762,890 N.E.2d 263. See, also, State v. Vrabel, 99 Ohio St.3d 184, 2003-Ohio-3193,790 N.E.2d 303; State v. Cowans, 87 Ohio St.3d 68, 1999-Ohio-250,717 N.E.2d 298.
 {¶ 31} Appellant initially argues that the doctrine of res ipsa loquitur applies to demonstrate appellant's lack of competency to stand trial. Appellant points to the facts and circumstances of the case, in which appellant killed and dismembered his father, who was the only person who provided appellant with any support. Appellant also argues that his lack of competency is demonstrated by his behavior after the murder, in which he wandered more or less in a circle around the area of I-71 where he had left his father's vehicle and was eventually found after removing most of his clothing. However, "[i]ncompetency must not be equated with mere mental or emotional instability or even outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." State v. Bock (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016.
 {¶ 32} In this case, the issue of competency was properly raised before trial, and the trial court appropriately followed the procedure to determine the issue. Appellant was initially found incompetent, and was later found to have been returned to competency. Appellant argues that by the time the trial started in August 2008, the March 7, 2008 competency evaluation was stale, and there was sufficient new information before the trial *Page 13 
court that the court should have either ordered a new competency evaluation or held an evidentiary hearing on the issue.
 {¶ 33} However, the only new information before the trial court since the March 7, 2008 report was that appellant had continued to refuse to cooperate either with counsel or with the attempts to evaluate him for an NGRI defense. Appellant's lack of cooperation had been ongoing from the beginning of the proceedings. However, notwithstanding the lack of cooperation, Dr. Tilley was able to obtain enough information from appellant to reach the conclusion that appellant understood the nature of the proceedings against him, was able to assist with his own defense, and that appellant's refusal to cooperate was most likely the result of malingering, and not the result of a mental illness. In addition, the trial court noted that based on his observations, appellant's refusal to cooperate with his counsel was a case of malingering, and was not the result of appellant being incompetent to stand trial.
 {¶ 34} Based on the opinions of the various mental healthcare professionals, and the trial court's superior position to consider appellant's behavior in the courtroom, we cannot say the trial court erred when it declined to order a new competency evaluation or to hold another hearing on the issue of appellant's competency, or when it concluded that appellant was competent to stand trial.
 {¶ 35} Accordingly, appellant's first assignment of error is overruled.
 {¶ 36} In his third assignment of error, appellant argues that his conviction for tampering with evidence was not supported by sufficient evidence and was against the manifest weight of the evidence. Sufficiency and weight of the evidence are separate, but related concepts. When reviewing the sufficiency of the evidence supporting a criminal *Page 14 
conviction, an appellate court must examine the evidence submitted at trial to determine whether such evidence, if believed, would convince an average person of the defendant's guilt beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. at paragraph two of the syllabus. See, also, Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 37} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Rather, the sufficiency of the evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."Jackson, supra, at 319. Accordingly, the reviewing court does not substitute its judgment for that of the fact finder. Jenks, supra, at 279.
 {¶ 38} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. However, in engaging in this weighing, the appellate court must bear in mind the fact finder's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230,39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on *Page 15 
"manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, supra, at 387.
 {¶ 39} Appellant was convicted of tampering with evidence in violation of R.C. 2921.12(A), which provides, in relevant part, that:
 No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]
 {¶ 40} Appellant argues that he could not have been convicted of tampering with evidence because the state offered no evidence that he altered, destroyed, concealed or removed anything for the purpose of impairing its availability as evidence against him. Appellant argues that the only things taken from the Kelly house were Mr. Kelly's arms and Mr. Kelly's vehicle, including the green tote in which Mr. Kelly's arms were found. With respect to Mr. Kelly's arms, appellant argues that their severance and removal did not impair their value as evidence and, if anything, increased their value as evidence. Similarly, appellant argues that the green tote had evidentiary value only as the container in which Mr. Kelly's arms were found, and its removal did not impair its evidentiary value.
 {¶ 41} First, we note that the jury could have reasonably inferred that appellant removed Mr. Kelly's arms and the clothing found in the green tote for the purpose of impairing their value of evidence. That their value as evidence was not actually impaired is not relevant to whether appellant was guilty of tampering with evidence based on his removal of those items from the scene of the murder. See Jenks, supra (circumstantial evidence to establish purpose element of tampering with evidence charge). *Page 16 
 {¶ 42} Furthermore, appellant's argument overlooks the fact that there was another knife at the murder scene that was never found. Special Agent Gary Wilgus ("Wilgus") of the Ohio Bureau of Criminal Identification and Investigation testified that there was an impression of a knife left on the back of Mr. Kelly's body. Wilgus testified that he could discern from the impression that the blade of the knife would have been attached to the handle by rivets. Wilgus further testified that neither the broken knife found in the closet next to Mr. Kelly's body nor the knife found in the green tote matched the impression on the back of Mr. Kelly's body. The jury could have reasonably concluded that the knife that left the impression on Mr. Kelly's body had been used in the commission of the crime, and that it had been removed from the scene and concealed for the purpose of impairing its evidentiary value.
 {¶ 43} Consequently, appellant's conviction for tampering with evidence was supported by sufficient evidence, and we cannot say the jury clearly lost its way in convicting him on that charge. Consequently, appellant's third assignment of error is overruled.
 {¶ 44} Having overruled all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 PETREE and T. BRYANT, JJ., concur.
T. BRYANT, J., retired of the Third Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1