[Cite as *State v. Karns,* 196 Ohio App.3d 731, 2011-Ohio-6109.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

THE STATE OF OHIO,                    :      JUDGES:
                                      :      William B. Hoffman, P.J.
              Appellee,               :      Sheila G. Farmer, J
       v.                             :      Julie A. Edwards, J.
                                      :
KARNS,                                :      Case No. 11-CA-18
                                      :
              Appellant.              :      O P I N I O N

CHARACTER OF PROCEEDING:              Criminal Appeal from Fairfield County
                                      Court of Common Pleas Case No.
                                      2010CR135

JUDGMENT:                             Reversed and Remanded

DATE OF JUDGMENT ENTRY:               November 21, 2011

APPEARANCES:

Gregg Marx, Fairfield County              Conrad Law Office L.L.C., and
Prosecuting Attorney, for appellee.       Aaron R. Conrad, for appellant.


       EDWARDS, Judge.

       {¶ 1} Defendant-appellant, Larry Karns, appeals from the denial by the Fairfield

County Court of Common Pleas of his motion to suppress. Plaintiff-appellee is the state

of Ohio.

                    STATEMENT OF THE FACTS AND CASE

       {¶ 2} On April 1, 2010, appellant was indicted by the Fairfield County Grand

Jury on one count of illegal assembly or possession of chemicals for the manufacture of

drugs in violation of R.C. 2925.04, a felony of the third degree; one count of illegal

manufacture of drugs in violation of R.C. 2925.04(A), a felony of the second degree;

and one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and 2925.11(C)(1)(b), a felony of the third degree. On May 17, 2010, appellant entered a plea of not guilty to the charges.

{¶ 3} Thereafter, on November 18, 2010, appellant filed a motion to suppress all evidence obtained as a result of a search that occurred on February 23, 2010. A hearing on that motion was held on December 15, 2010. The following testimony was adduced at the hearing.

{¶ 4} Larry Harmon is an intensive-probation officer for Fairfield County Court of Common Pleas. Harmon testified that Misty Castle was assigned to him as a probationer on January 27, 2010, after she was placed on intervention in lieu of conviction. When Harmon met with Castle, she told him that she was living at 136 North Ewing Street in the city of Lancaster. According to Harmon, Castle indicated that she was living there with appellant, who was her boyfriend, and his parents, George and Mary Karns, who owned the residence. As a condition of her community control, Castle consented to a search of her property and her residence, "which included common areas within the residence and areas that are exclusive to me, at any time" by community-control officers.

{¶ 5} Harmon testified that Castle was given a "Non-Probationer Acknowledgment and Waiver" form that was to be completed and signed by George and Mary Karns. The form, which was admitted at the hearing, states as follows:

{¶ 6} "I ___, residing at ____ have read the attached copy of the Stipulations and Agreements, specifically item C, and voluntarily and knowingly agree to consent to such searches, as listed in item C, of my said residence, where (probationer), lives.

This agreement is in support of (probationer) and his/her agreement with the Fairfield County Probation Department * * *.

**{¶ 7}** "I also understand that by signing this document, I expressly waive my Constitutional rights under the Fourth Amendment to a search of my residence and property as it applies to common areas shared with the probationer and areas that are exclusive to the probationer."

**{¶ 8}** The form was never completed or returned to Harmon.

**{¶ 9}** According to Harmon, he never saw Castle after February 3 or 4, 2010. Due to Castle's failure to report as ordered, Harmon, on February 23, 2010, went to 136 North Ewing with two other probation officers. Harmon testified that the house was set back off the street next to an alley and that all entrances to the house came from the alley. The probation officers noticed that there were cameras on the back side of the house, aimed at the back alley. Harmon testified that the probation officers noticed a TV monitor on and saw themselves on the TV monitor. It was later determined that the monitor was in the locked bedroom of appellant and Castle. The following is an excerpt from Harmon's testimony:

**{¶ 10}** "Q. When you saw those cameras, when you saw that you were appearing on a television or a monitor that appeared to be connected to the cameras, what did you think?"

**{¶ 11}** "A. For a law enforcement officer, that's kind of common knowledge that there could be something going on there that they had a reason to be aware who's coming or approaching the house.

{¶ 12} "Q. And in your experience and training, did that make you all feel suspicious?

{¶ 13} "A. We were suspicious. Usually in that case, it could be some activities going on there, maybe drug activities, whatever."

{¶ 14} Harmon then notified the Lancaster Police Department and asked for a unit to be sent for backup. When the police officer arrived, the four of them proceeded to knock on the house doors. When Mary Karns came to one of the doors, Harmon spoke with her and explained why he was there, and he was told that Misty Castle was residing there. According to Harmon, Mary Karns indicated that she had never seen the nonprobationer form and did not realize that Castle was on community control/probation. George Karns also indicated that he was unaware that Castle was on community control/probation.

{¶ 15} According to Harmon, once he explained to Mary Karns why the officers were there and what their objective was, she invited them into her house. Mary Karns told Harmon that Castle and appellant lived in a room across from the entrance door. The room was locked. Mary Karns told Harmon that the room was always kept locked, even when Castle and appellant were home. Harmon testified that he found it strange and "not normal" that the door was locked and that it made him suspicious. According to Harmon, Mary Karns stated that she thought that he could open the door by jimmying it and then offered him a coat hanger to open the door. The officers then gained entrance to the room using the coat hanger. Upon entering the room, the officers found evidence of what they believed to be methamphetamine production and use.

{¶ 16} After speaking with a deputy who ran training seminars on methamphetamines, the officers were told to evacuate the house. Both the major-crimes unit and the fire department were called and arrived on the scene. Major-crime unit detectives, after verifying that the room likely contained a methamphetamine lab, obtained a search warrant before conducting a full search and seizure of contraband.

{¶ 17} On cross-examination, Harmon admitted that while the cameras could be an indicator of drug activity, they just as easily could not be. The following testimony was adduced when he was asked whether he had any reason other than the television cameras to believe that criminal activity was occurring at the house:

{¶ 18} "A. I had no reason to believe that there was criminal activity going on, other than the cameras to me indicated not being a normal situation, what the common knowledge of that could be.

{¶ 19} "Q. Okay. But the cameras in and of themselves did not lead you to conclude that there was criminal activity going on at that time"

{¶ 20} "A. No."

{¶ 21} On redirect, Harmon indicated that both Mary and George Karns had invited him into the residence. He testified that the fact that the bedroom door was locked made him suspicious because it was "not normal."

{¶ 22} At the hearing, Mary Karns testified that the cameras were installed after appellant had his Jeep stolen and that she told Harmon about the car being stolen. She testified that she had told Harmon that Castle did not live there, but that when Castle was there, she stayed in appellant's room. According to Mary Karns, Castle was at her house two or three times a week, or more. Mary Karns testified that she did not have a

key to appellant's room. Mary Karns further testified that the door to appellant's room was always open. She further testified that she had never seen the nonprobationer waiver form and that she would not have signed it. On cross-examination, she testified that her husband told the officers that they could not go through the house because they did not have a warrant.

{¶ 23} George Karns testified that he owned the residence on Ewing Street and that the cameras were installed after appellant had his Jeep stolen. George Karns testified that while he was talking to Harmon, two police officers came around the house and indicated that they were going to enter appellant's room. George Karns testified that they told him that they had probable cause to enter the room and that he told them to get a search warrant. According to George Karns, the officers broke the door down. George Karns denied that he offered to kick the door in for the officers. He testified that appellant's room was locked all the time and that he did not have a key, but he could get into the room any time he wanted to and was in and out of the room all the time. According to George Karns, Castle must have lived there because she was there all the time. George Karns testified that he never told Castle that she could live there and that he told his wife that he did not want Castle there. He also testified that he never saw or signed a nonprobationer acknowledgment and waiver form.

{¶ 24} On cross-examination, George Karns testified that he never told any of the officers that they could kick down the door to appellant's room. Larry Harmon, on rebuttal, testified that Mary Karns told him that Castle lived there with appellant in his room. He further testified that Mary Karns never indicated that she went in appellant's room periodically, but told him that the room was always locked and that they could not

enter the room. Harmon also testified that George Karns told him that he could kick in the door and denied that George Karns ever told him that he went in appellant's room on various occasions.

{¶ 25} Pursuant to an entry filed on January 13, 2011, the trial court overruled appellant's motion to suppress. In its entry, the trial court stated as follows: "Based on the totality of the circumstances, the Court finds that the search of Defendant's locked room in his parents' house was supported by reasonable suspicion that Misty Castle was engaged in criminal activity connected to that room."

{¶ 26} Thereafter, on February 28, 2011, appellant pleaded no contest to one count of illegal assembly or possession of chemicals for the manufacture of drugs (Count One) and one count of aggravated possession of drugs (Count Three). The trial court found appellant guilty. The remaining count was dismissed. As memorialized in a judgment entry filed on March 2, 2011, appellant was sentenced to three years in prison on Count One and to four years in prison on Count Three. The trial court ordered that the sentences be served consecutively to each other and to a sentence imposed in a case out of Hocking County Court of Common Pleas. The trial court, with respect to Count Three, placed appellant on community control for a period of five years upon his release from prison.

{¶ 27} Appellant now raises the following assignment of error on appeal:

{¶ 28} "The court erred by not suppressing the evidence gathered as a result of the unconstitutional search of appellant's residence, because said search was conducted without a warrant and without his consent, in violation of appellant's fourth amendment right against unreasonable searches and seizures."

{¶ 29} In his sole assignment of error, appellant argues that the trial court erred in overruling his motion to suppress.  We agree.

{¶ 30} Appellate review of a trial court's decision to grant a motion to suppress involves a mixed question of law and fact.  *State v. Long* (1998), 127 Ohio App.3d 328, 713 N.E.2d 1.  During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility.  *State v. Brooks* (1996)*,* 75 Ohio St.3d 148, 661 N.E.2d 1030.  A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Medcalf* (1996), 111 Ohio App.3d 142, 675 N.E.2d 1268.  Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard.  *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.

{¶ 31} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal.  First, an appellant may challenge the trial court's finding of fact.  In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence.  See *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583, and *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141.  Second, an appellant may argue that the trial court failed to apply the appropriate test or correct law to the findings of fact.  In that case, an appellate court can reverse the trial court for committing an error of law.  See *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.  Finally, an appellant may argue that the trial court has incorrectly decided the ultimate or final issues raised in a motion

to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Claytor* (1993), 85 Ohio App.3d 623, 620 N .E.2d 906, and *State v. Curry* (1994), 95 Ohio App.3d 93, 641 N.E.2d 1172.

**{¶ 32}** Appellant argues that there was not reasonable suspicion to conduct a warrantless search of his residence. In turn, appellee maintains that probation officers are authorized to search a probationer's residence when there is a reasonable suspicion to believe that the probationer is not abiding by the law. In its entry, the trial court noted that the parties agreed that if the search was legal as to Castle, it was also legal as to appellant.

**{¶ 33}** "[A] probation officer may search a probationer's home without a warrant and upon less than probable cause." *State v. Cowans* (1999)*,* 87 Ohio St.3d 68, 76, 717 N.E.2d 298, citing *Griffin v. Wisconsin* (1987), 483 U.S. 868, 877-878, 107 S.Ct. 3164, 97 L.Ed.2d 709. Ohio law permits a probation officer to conduct a warrantless search of a probationer's person or home if an officer has "reasonable grounds" to believe that the probationer failed to abide by the law or by the terms of probation. See *State v. Hendricks*, Cuyahoga App. No. 92213, 2009-Ohio-5556. To establish "reasonable grounds," an officer need not possess the same level of certainty that is necessary to establish "probable cause." Instead, the officer's information need only establish the "likelihood" that contraband will be found in a probationer's home. *State v. Howell* (Nov. 17, 1998), Jackson App. No. 97CA824, 1998 WL 807800; *Helton v. Ohio Adult Parole Auth.* (June 26, 2001), Franklin App. No. 00AP-1108, 2001 WL 709946.

{¶ 34} In *United States v. Knights* (2001), 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497, the United States Supreme Court upheld "probation searches" conducted pursuant to a condition of probation, provided that a "reasonable suspicion" exists that evidence of criminal activity can be found in a probationer's home. Id. at 120-121. "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." (Citations omitted.) *Knights* at 121. The consent form in *Knights* stated that a search could be conducted without a warrant. See also *State v. Sowards,* Gallia App. No. 06CA13, 2007-Ohio-4863.

{¶ 35} We find, upon our review of the record, that the trial court erred in finding that there was a reasonable suspicion that Castle was engaged in criminal activity and that evidence or contraband connected with that activity was within appellant's locked room. While Probation Officer Harmon testified that from his experience and training, the closed-circuit surveillance system made him suspicious of drug activity, he later admitted that the system could just as easily not be an indicator of drug activity. As is stated above, the following testimony was adduced when Harmon was asked whether, other than the television cameras that he saw, he had any reason to believe that criminal activity was occurring at the house:

**{¶ 36}** "A. I had no reason to believe that there was criminal activity going on, other than the cameras to me indicated not being a normal situation, what the common knowledge of that could be.

**{¶ 37}** "Q. Okay. But the cameras in and of themselves did not lead you to conclude that there was criminal activity going on at that time"

**{¶ 38}** "A. No."

**{¶ 39}** While Harmon also testified that the fact that appellant's room was always kept locked made him suspicious, we find that the locked door does not lead to a reasonable suspicion that criminal activity is underfoot. Appellant, at the time, was a divorced man living with his parents.

**{¶ 40}** We find, based on the foregoing, that the trial court erred in finding that the search of appellant's room was supported by a reasonable suspicion that Misty Castle was engaged in criminal activity connected to that room.

**{¶ 41}** Based on the foregoing, we find that the trial court erred in denying appellant's motion to suppress.

**{¶ 42}** Appellant's sole assignment of error is, therefore, sustained.

**{¶ 43}** Accordingly, the judgment of the Fairfield County Court of Common Pleas is reversed, and this matter is remanded for further proceedings.

Judgment reversed

and cause remanded.

HOFFMAN, P.J., concurs.

FARMER, J., dissents.

FARMER, J., dissenting.

{¶ 44} I respectfully dissent from the majority's opinion that the probation officer lacked reasonable suspicion to enter Misty Castle's room.

{¶ 45} First, Castle was in violation of her probation for failure to report; second, apart from the assertions that the cameras were installed because of a recent auto theft, the probation officer's opinion about the cameras should have been given equal weight.

{¶ 46} In *State v. Benton* (1998)*, 82 Ohio St.3d 316, syllabus, the Supreme Court of Ohio held: "A warrantless search performed pursuant to a condition of parole requiring a parolee to submit to random searches of his or her person, motor vehicle, or place of residence by a parole officer at any time is constitutional."

{¶ 47} Since the *Benton* decision, the Ohio General Assembly addressed the issue of consent to search by parolees and adopted the "reasonable-grounds" test as set forth in R.C. 2967.131(C) as follows:

{¶ 48} "During the period of a conditional pardon or parole, of transitional control, or of another form of authorized release from confinement in a state correctional institution that is granted to an individual and that involves the placement of the individual under the supervision of the adult parole authority, and during a period of post-release control of a felon imposed under section 2967.28 of the Revised Code, authorized field officers of the authority who are engaged within the scope of their supervisory duties or responsibilities may search, with or without a warrant, the person of the individual or felon, the place of residence of the individual or felon, and a motor vehicle, another item of tangible or intangible personal property, or other real property in which the individual or felon has a right, title, or interest or for which the individual or

felon has the express or implied permission of a person with a right, title, or interest to use, occupy, or possess, if the field officers have reasonable grounds to believe that the individual or felon has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's or felon's conditional pardon, parole, transitional control, other form of authorized release, or post-release control. The authority shall provide each individual who is granted a conditional pardon or parole, transitional control, or another form of authorized release from confinement in a state correctional institution and each felon who is under post-release control with a written notice that informs the individual or felon that authorized field officers of the authority who are engaged within the scope of their supervisory duties or responsibilities may conduct those types of searches during the period of the conditional pardon, parole, transitional control, other form of authorized release, or post-release control if they have reasonable grounds to believe that the individual or felon has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's or felon's conditional pardon, parole, transitional control, other form of authorized release, or post-release control."

{¶ 49} As noted in the statute, the reasonable-grounds test is extended to include a felon who has "left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions" of the felon's conditional pardon or parole.

{¶ 50} The reasonable-grounds test as embraced by the United State Supreme Court in *Griffin v. Wisconsin* (1987), 483 U.S. 868, and embraced by the Ohio General Assembly, is a less stringent test than the reasonable-suspicion standard embraced by the majority.

**{¶ 51}** Using R.C. 2967.131(C) as a template for county-supervised probationers, I would find that there was clear evidence that the probationer sub judice absconded from the jurisdiction and failed to report or otherwise did not comply with her intensive-probation supervision.

**{¶ 52}** I would deny the assignment of error and find that the trial court did not err in denying the motion to suppress.

_____